**UNITED STATES of America,
Plaintiff–Appellee,**

**and**

**Molita Bryant; Wesley Palmer,
Parties in Interest,**

**v.**

**Thomas E. SMITH, Jr., a/k/a Anthony Young, Defendant–Appellant.**

United States of America,
Plaintiff–Appellee,

and

Molita Bryant; Wesley Palmer,
Parties in Interest,

v.

Tyrone Smallwood, Defendant–
Appellant.

Nos. 04–4574, 04–4575.

United States Court of Appeals,
Fourth Circuit.

Argued: May 26, 2006.

Decided: June 30, 2006.

**ARGUED:** Frank Salvato, Alexandria, Virginia; Meghan Suzanne Skelton, Assistant Federal Public Defender, Office of the Federal Public Defender, Alexandria, Virginia, for Appellants. Brian David Miller, General Services Administration, Office of the Inspector General, Washington, D.C., for Appellee. **ON BRIEF:** Lana Marie Manitta, Martin & Arif, Springfield, Virginia, for Appellant Tyrone Smallwood. Frank W. Dunham, Jr., Federal Public Defender, Ivan D. Davis, Assistant Federal Public Defender, Office of the Federal Public Defender, Alexandria, Virginia, for Appellant Thomas E. Smith, Jr. Paul J.

McNulty, United States Attorney, Erik R. Barnett, Assistant United States Attorney, Office of the United States Attorney, Alexandria, Virginia, for Appellee.

Before WILKINSON and WILLIAMS, Circuit Judges, and Glen E. CONRAD, United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge WILLIAMS and Judge CONRAD joined.

## OPINION

WILKINSON, Circuit Judge:

Defendants Thomas E. Smith, Jr. and Tyrone Smallwood appeal their convictions and sentences arising from their participation in a large crack cocaine conspiracy and the murder of Conrad Shelton. Defendants primarily contend that the district court assumed the role of a prosecutor by rehabilitating government witnesses and frequently interrupting defense counsel's cross-examination. They further argue that venue was lacking in the Eastern District of Virginia. We hold there was no error in either respect. District courts deserve latitude in overseeing the presentation of evidence during a criminal proceeding, and the essential guarantee of a fair trial was not infringed. We further hold that venue on all counts was proper in the Eastern District because several acts in furtherance of the underlying drug conspiracy were perpetrated there. With respect to all other issues raised, we find no error, and thus affirm the judgment of the district court.

## I.

This case arises from the prosecution of members of a large drug manufacturing and distribution ring that operated in Virginia, Maryland, and Washington, D.C., during the 1990s. Defendants Thomas Smith and Tyrone Smallwood were key participants in this criminal organization, which was spearheaded by Walter Fleming, who has since pleaded guilty. Evidence adduced at trial revealed an extensive conspiracy dedicated to selling crack cocaine, and we shall undertake only a summary of those events relevant to the issues presented here.

Smith and Smallwood worked as partners in Fleming's distribution scheme. The two maintained several residences, including a Washington, D.C., apartment that Smith had rented under an alias. Defendants utilized this apartment to store drugs and convert powder cocaine into crack. Smith also used his alias to lease a house in Hyattsville, Maryland. On November 4, 1996, authorities searched this home, found both defendants present, and discovered Smallwood attempting to flush drugs down a toilet. As part of the raid, officers seized drugs, drug paraphernalia, firearms, body armor, cash, and vehicles, including Smith's Toyota Land Cruiser, which defendants had used to facilitate drug transactions. Other evidence introduced at trial showed that Smallwood had sold large amounts of crack cocaine on numerous occasions, including two separate sales of one-eighth of a kilogram of crack for $2800, one of which was conducted near a community swimming pool. When confronted by the FBI in 2001, Smith stated: "I am definitely guilty of a drug conspiracy and dealing drugs in the past."

Smallwood also had a role as an enforcer in Fleming's drug network, frequently accompanying Fleming on missions to confront individuals whom Fleming suspected of spreading rumors and stealing crack. On one mission, Fleming, with Smallwood

present, shot a member of his own crew, later discarding his weapon in the Anacostia River. On another, Smallwood joined Fleming to interrogate an individual who had spread a story that Fleming was cooperating with authorities. Fleming later arranged to have this man killed.

Much of the evidence presented at trial concerned the murder of Conrad Shelton, an addict who did odd jobs for Smith and Smallwood in exchange for crack cocaine. Shelton's handyman duties included washing cars for defendants and their associates. Anthony Brown, who pleaded guilty to aiding and abetting Shelton's murder, testified that Shelton was not paid in crack until he finished the washing because Shelton would otherwise rush through the job in order to get high.

In early 1996, Smallwood discovered that one of his apartments had been robbed, and drugs and money taken. Smallwood suspected that Shelton—with his knowledge of defendants' residences and drug operation—had played a role in the theft. On February 11, 1996, Shelton received several phone calls, and told his girlfriend, Barbara Wyatt, that he was going to Smallwood's apartment. According to Wyatt, Shelton was nervous and agitated because he had been involved in stealing crack from Smallwood. Shelton was seen with more crack than usual that day.

Once Shelton arrived at Smallwood's apartment, Smallwood accused Shelton of organizing the burglary, and threatened to kill him. Smallwood, Smith, Anthony Brown, and Shelton then got in a car so that Shelton could help the defendants locate the person who had stolen Smallwood's drugs and cash. They eventually parked the car at the mouth of an alley in Washington, D.C., and while Brown acted as a lookout, Smith shot Shelton in the head. Both defendants thereafter fired multiple rounds into Shelton's body, twelve shots in all. Two of Shelton's head wounds contained soot and stipple, suggesting shots fired at point-blank range. Ballistic examinations further revealed that the bullets and cartridges at the scene of the murder matched guns that defendants habitually carried and that they were seen with that evening. Shelton's murder went unsolved for some time. Years later, when confronted by the FBI, Smith admitted that he often beat Shelton when narcotics or money were missing, and that he "could straighten out the story and clarify what happened when [Shelton] was killed."

On December 23, 2003, a federal grand jury in the Eastern District of Virginia indicted Smith for conspiracy to distribute more than fifty grams of cocaine base (crack cocaine), see 21 U.S.C. § 846 (2000) (Count One), and both defendants for murder while engaged in a drug trafficking crime, see id. § 848(e)(1)(A) (Count Two), and the use of a firearm in relation to a drug trafficking crime, causing the death of Conrad Shelton, see 18 U.S.C. § 924(c)(1)(A), (j) (2000) (Count Three). Defendant Smallwood was charged only with Counts Two and Three because he had pleaded guilty to his role in the drug conspiracy in the District of Columbia in 1996.

A jury trial was conducted from February 9 to February 24, 2004, at the conclusion of which the jury found defendants guilty on all counts. The district court sentenced Smith to concurrent life sentences for the drug conspiracy and murder, and to a 120–month consecutive sentence for the use of a firearm. Smallwood was likewise sentenced to life in prison for Shelton's murder, plus an additional 120 months for the firearm offense. From these convictions and sentences, defendants bring this appeal.

## II.

Defendants' primary contention is that they were denied a fair trial because the district judge improperly intervened with prosecution-friendly questions and interruptions. We believe, however, that the district court acted appropriately in ensuring that matters were clearly presented to the jury, and that a multi-week trial did not bog down.

## A.

We begin with the standard of review. Defendants neglected to raise at trial any objections to judicial intervention, and so we review their allegations here for plain error. *See United States v. Godwin,* 272 F.3d 659, 672 (4th Cir.2001). Under the Federal Rules of Evidence, "[t]he court may interrogate witnesses," and "[o]bjections to ... interrogation by [the court] may be made at the time or at the next opportunity when the jury is not present." Fed.R.Evid. 614(b), (c). Defendants in this case failed to do either. A defendant is, of course, not required to object to each and every question or comment that a district court makes, as such interjection would inevitably prove disruptive at trial. But where, as here, defendants failed to bring even a single alleged error to the district court's attention during trial, we cannot conclude that they preserved this issue for appeal. *See Godwin,* 272 F.3d at 672.

Defendants nevertheless contend that harmless error review is required because they filed both a motion in limine and a post-verdict motion on judicial intervention. This argument must fail, for the former was premature and the latter dilatory. It is true that motions in limine may in some circumstances suffice to preserve an error for appeal. *See, e.g., United States v. Ellis,* 121 F.3d 908, 918 (4th Cir.1997). But in the context of improper judicial intervention, pretrial motions will not typically constitute a proper objection because the exact nature of any judicial overreaching cannot be known until the trial is underway. *See United States v. Williams,* 81 F.3d 1321, 1325 (4th Cir. 1996) (motion in limine did not preserve error where it "was not based upon nor did it seek a ruling on the *precise* issue [defendant] now seeks to raise") (emphasis added).

The whole purpose of raising objections is to put district courts on notice of their alleged mistakes. Defendants' motion in limine—with its general request that the trial court "refrain from any actions which may be interpreted by the jury as favoring the government over the defense especially regarding the Court questioning or rehabilitating witnesses"—failed to alert the trial judge to any improper questioning with the required specificity. Indeed, far from the contemplated timely objection, defendants' motion in limine sought in effect to charge the district judge with bias before the trial had even so much as started.

While the motion in limine provided the district court with no indication of the nature of its errors, defendants' post-verdict motion gave the court no opportunity to redress them. A primary purpose of Federal Rule of Evidence 614(c) is to "assur[e] that objections are made in apt time to afford the opportunity to take possible corrective measures." Fed.R.Evid. 614 advisory committee's note to subdiv. (c). A post-trial motion does not suffice to preserve errors of judicial interference, *see Godwin,* 272 F.3d at 672, and litigants may not attempt to blindside district courts by pointing out errors long after the opportunity to take immediate curative action has passed.

██ For the reasons set forth above, plain error review is appropriate. Under this standard, we examine the record for plain error that affects substantial rights, and even then, we are not required to notice the error unless it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano,* 507 U.S. 725, 732–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). In the specific context of judicial intervention claims, "we may not intervene unless the judge's comments were so prejudicial as to deny the defendants an opportunity for a fair and impartial trial." *Godwin,* 272 F.3d at 673 (internal quotation marks and alterations omitted). We now turn to the issue at hand.

### B.

Defendants' specific allegations of inappropriate judicial intervention center on the questioning of three witnesses, Walter Fleming, Gary Stanley, and Anthony Brown, who as noted, had earlier pleaded guilty to aiding and abetting the Shelton murder. With respect to Brown, defendants contend that during the government's direct examination, the district court bolstered the prosecution's case by tossing "softball" questions to Brown. For example, during Brown's testimony about events at Smallwood's apartment prior to Shelton's death, the following colloquy took place:

> *Prosecution:* What, if anything, did you see Ty [Smallwood] do then?
>
> *The Witness:* He was—he looked at Conrad [Shelton], then he went and turned the music up, and he grabbed one of the guns, and he pointed it to his head, and he was like, "I should kill you." But he didn't at the time.
>
> *The Court:* Pointed at whose head?
>
> *The Witness:* At Conrad.
>
> *The Court:* Who pointed it?

> *The Witness:* Tyrone Smallwood.
>
> *The Court:* Who pointed the gun?
>
> *The Witness:* Ty pointed the gun.
>
> *The Court:* Next question.

Defendants further contend that the district court was particularly aggressive during defense counsel's cross-examination of Brown, making at least nineteen sua sponte objections to various questions and repeatedly punctuating the proceedings with requests for counsel to speed things up. *See, e.g.,* J.A. 1604 ("Let's go on."); J.A. 1604–05 ("No further question on that. It's enough. It's collateral. Let's proceed."); J.A. 1643 ("Let's get to the heart of it, Mr. Salvato."). They likewise argue that the district judge frequently attempted to rehabilitate Brown during cross-examination, thereby strengthening the government's theory that Brown was in fact present during the murder. For example, when defense counsel was questioning Brown about possible discrepancies in his account, the district court asked Brown if he had "go[ne] up to the body after Shelton was shot," suggesting that Brown was in a position to do so. Defendants raise similar allegations with respect to the questioning of Walter Fleming as they do for Brown, although as we noted above, defendants did not raise objections during the trial itself.

With regard to Gary Stanley, Smallwood's nephew, defendants contend that the district court improperly expressed disbelief at Stanley's testimony. Part of the government's case included evidence that Smallwood was accidentally shot in the foot during Shelton's murder. The defense, in turn, attempted to show that Smallwood had suffered a foot injury several years prior. To this end, it called Stanley, Smallwood's nephew, and showed him photographs of feet that were alleged-

ly Smallwood's. The following colloquy took place:

> *Defense Counsel:* Are you able to see the area where the injury was in those photographs?
>
> *The Witness:* Yes.
>
> *The Court:* Just a moment. Do you recognize that as your uncle's feet?
>
> *The Witness:* Yes.
>
> *The Court:* You do?
>
> *The Witness:* Yes, sir.
>
> *The Court:* You think you can recognize your uncle's feet?
>
> *The Witness:* Yes.
>
> *The Court:* Next question.

On this basis, defendants contend that the district court led the jury to believe that Stanley's testimony was incredible. They further argue that the prosecution in its closing argument capitalized on the district court's involvement by referencing "the great amazement of some in this courtroom" when discussing Stanley's testimony that he recognized Smallwood from photographs of feet alone.

## C.

 Questions of trial management are quintessentially the province of the district courts. Allegations of judicial intervention during witness testimony implicate two core trial oversight responsibilities. First, trial judges "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to ... make the interrogation and presentation effective for the ascertainment of the truth." Fed. R.Evid. 611(a). In this regard, it is " 'settled beyond doubt that in a federal court the judge has the right, and often [the] obligation, to interrupt the presentations of counsel in order to clarify misunderstandings.' " *United States v. Morrow,* 925 F.2d 779, 781 (4th Cir.1991) (quoting

*United States v. Cole,* 491 F.2d 1276, 1278 (4th Cir.1974) (per curiam)); *see also* Fed. R.Evid. 614(b). It is neither possible nor desirable for district judges to sit back and observe trials as nonchalant spectators, as judicial participation is frequently necessary to ensure that uncertainty sown during testimony does not culminate in jury room confusion. *See, e.g., United States v. King,* 119 F.3d 290, 294–95 (4th Cir.1997); *United States v. Castner,* 50 F.3d 1267, 1272–73 (4th Cir.1995); *United States v. Parodi,* 703 F.2d 768, 775 (4th Cir.1983). This obligation is not, of course, without its limits. Trial judges are not backstop counsel, entitled to step in whenever a point may be more eloquently delivered or a tactical misstep avoided. But it remains their prerogative to make certain that matters are clearly presented to the jury.

 Second, and related, district courts have an affirmative duty to prevent trials from becoming protracted and costly affairs. Indeed, they must manage litigation to "avoid needless consumption of time." Fed.R.Evid. 611(a); *see also Morrow,* 925 F.2d at 781. Particularly during the course of multi-week trials, witness questioning may skitter off in collateral directions. District judges have the duty to rein in such questioning when it strays too far from matters in dispute. And even when testimony is limited to relevant areas, they have the further obligation to ensure that the presentation of evidence does not become rambling and repetitious. Judicial resources are not limitless, and drawn-out trials make jury service increasingly incompatible with normal family and employment obligations. Trial judges are thus entirely within their right to keep trial proceedings moving, and, if necessary, to ask counsel to pick up the pace.

 In fulfilling these two fundamental trial management obligations, district court judges may adopt a variety of ap-

proaches. Some may be more temperate and understated, interposing themselves only infrequently. Others may seek greater involvement and take a firmer role. But "even a stern and short-tempered judge's ordinary efforts at courtroom administration ... do not establish bias or partiality." *Castner,* 50 F.3d at 1274 (internal quotation marks omitted); *see also United States v. Cassiagnol,* 420 F.2d 868, 877 (4th Cir.1970). Trials are serious business. A district judge's interruptions, even when abrupt, may be only part and parcel of a pointed adversarial process designed to develop a clear set of facts in a relatively short amount of time. A tart remark or two might be what is needed to keep a lengthy trial on track. The entire goal, of course, is to ensure that trials reach fair and just results—but while there is only one goal, there are many courtroom styles that can achieve it.

▇ In this case, we conclude that the trial court's conduct revealed no bias and crossed no line. It represented the judge's permissible attempt to cabin and control a two-week trial that featured numerous witnesses, extensive amounts of evidence, and, even on appeal, an eight-volume joint appendix totaling well over 2600 pages. The inability of cold transcripts to replicate the human dynamics of a trial suggests caution in the review of judicial interference claims. It should thus come as no surprise that we apply a measure of deference to the judgments of those to whom, after all, the conduct of trial has been textually entrusted. *See* Fed.R.Evid. 611(a); 614(a)-(b). While the record may at times suggest the advisability of greater restraint, it is in no way indicative of bias or other conduct that deprived defendants of their right to a fair trial.

Many of the interventions were hardly inappropriate. The portions of the record that defendants cite in their briefs often isolate the district judge's questions from their place in a witness's entire testimony. What defendants characterize as softball judicial questioning and rehabilitation of prosecution witnesses was, properly considered, the fulfillment of an "obligation to clarify confused factual issues or misunderstandings." *Castner,* 50 F.3d at 1273. The court's interrogation of Brown about events at Smallwood's apartment prior to Shelton's death, for example, do not appear aimed at establishing witness credibility but at focusing attention on two points—who pointed a gun, and at whom.

The district court's sua sponte objections to particular questions were similarly permissible. The court spoke up when defense counsel posed questions that were difficult to understand, that had already been asked and answered, or that were otherwise irrelevant. On occasion, the court's questions were designed to encourage witnesses to make themselves more audible. The requests that defense counsel move things along were also for the most part routine and innocuous. Finally, with respect to Stanley's testimony about Smallwood's foot injury, "it is settled that a trial judge possesses broad authority to interrogate witnesses." *Godwin,* 272 F.3d at 672. In ensuring that the jury would understand the evidence before it, we cannot say that the district court acted inappropriately by verifying the foundation of testimony that bordered on the unusual.

In all events, the district court properly instructed the jury that the court's participation during testimony was not to be interpreted as commentary on the persuasiveness of the evidence itself. As it expressly reminded jurors: "during the course of the trial, the Court may have asked questions of a witness. Do not assume that the Court has held any opinion on matters to which any questions may relate." The district judge can hardly be

faulted for not giving a similar admonition at the end of a particular exchange when there was not during the trial a single objection. And, as the record reveals, the district court was actively engaged during the government's questioning as well, often breaking in when appropriate.

We recognize that judges can take cases from the hands of counsel, and can abuse both their courtroom authority and the respect and deference with which jurors may regard them. But it is likewise true that counsel can take cases from judges, through a variety of dilatory, badgering, and diversionary tactics. The delicacy of the balance suggests appellate caution in removing the reins from trial judges in basic matters of litigation management. We find no reason to do so here. Defendants may not point to isolated portions of a voluminous record in the apparent assumption that split-second exchanges between trial participants tarnished a well-run and lengthy case. There was no reversible error, much less plain error, in the trial court's conduct.

## III.

Defendants next contend that venue was not proper in the Eastern District of Virginia. They note that many of the events related to the drug conspiracy occurred outside of Virginia, and that Shelton was murdered in Washington, D.C.

Our Constitution sets forth the basic parameters for venue in a criminal case. Under Article III, "[t]he Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3; see also U.S. Const. amend. VI. Federal Rule of Criminal Procedure 18 reiterates this principle: "Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."

Together, constitutional and statutory venue provisions protect criminal defendants from the inconvenience and prejudice of prosecution in a far-flung district bearing no connection to their offenses. See United States v. Ebersole, 411 F.3d 517, 524 (4th Cir.2005).

At the same time, however, our venue rules do not require the government to prosecute in any particular district when venue lies in multiple locations. See Ebersole, 411 F.3d at 524; United States v. Bowens, 224 F.3d 302, 309 (4th Cir.2000). Where venue requirements are met, the prosecution may proceed in that district, notwithstanding the possibility that the gravamen of the wrongdoing took place elsewhere. Such a rule is both even-handed and practical: there is no unfairness in prosecuting a defendant in a district in which he has committed a crime, and there are good reasons to avoid an indeterminate inquiry into the relative seriousness of multi-district misconduct.

When a criminal offense does not include a specific venue provision, venue " 'must be determined from the nature of the crime alleged and the location of the act or acts constituting it.' " United States v. Cabrales, 524 U.S. 1, 6–7, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998) (quoting United States v. Anderson, 328 U.S. 699, 703, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946)); see also Bowens, 224 F.3d at 308. This inquiry is twofold. We must "initially identify the conduct constituting the offense," United States v. Rodriguez–Moreno, 526 U.S. 275, 279, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999), because venue "on a count is proper only in a district in which an essential conduct element of the offense took place," United States v. Villarini, 238 F.3d 530, 533–34 (4th Cir.2001). We must then determine where the criminal conduct was committed. See Rodriguez–Moreno,

526 U.S. at 279, 119 S.Ct. 1239; *United States v. Barnette*, 211 F.3d 803, 813 (4th Cir.2000). When defendants are charged with multiple counts, venue must lie as to each individual count. *See United States v. Robinson*, 275 F.3d 371, 378 (4th Cir. 2001). With these principles in place, we turn to the indictment, explaining why venue was proper for each of the three charges.

 Count One charged Smith with conspiracy to distribute more than fifty grams of cocaine base. *See* 21 U.S.C. § 846 (2000). In a conspiracy case, "a prosecution may be brought in any district in which any act in furtherance of the conspiracy was committed," and "proof of acts by one co-conspirator can be attributed to all members of the conspiracy." *United States v. Al–Talib*, 55 F.3d 923, 928 (4th Cir.1995); *see also* 18 U.S.C. § 3237(a); *Bowens*, 224 F.3d at 311 n. 4. Acts in furtherance of a criminal conspiracy include exploits large and small, dealings that represent turning points in the conspiracy and those that merely enable it to continue its operations. *See, e.g., Al–Talib*, 55 F.3d at 928 (acts in furtherance of conspiracy include arrival by plane in district and travel by car through district).

We conclude that venue for Count One was proper in the Eastern District of Virginia because various acts in furtherance of the drug conspiracy took place there. To begin with, Akil Nurriden, a co-conspirator, lived in Alexandria, Virginia. In July 1996, law enforcement agents searched his residence and found approximately $40,000, as well as firearms, ammunition, and crack cocaine stashed in a secret console in his vehicle. Walter Fleming, the conspiracy's putative leader, testified that he had cooked the crack found in Nurriden's vehicle. Nurriden's contacts with the Eastern District were alone sufficient to establish venue, *see Al–Talib*, 55 F.3d at 928, but the conspiracy engaged in other conduct in the Eastern District as well. Fleming used drug proceeds to purchase several cars for the drug operation in Arlington, Virginia, and had a hidden drug compartment installed in a vehicle in Manassas, Virginia. Finally, Smith registered his Toyota Land Cruiser in Virginia using a Manassas address. Both defendants used this vehicle to make drug transactions. In short, "[f]ar more insubstantial acts have served to establish venue in similar conspiracy cases." *Id.*

 Count Two charged defendants with the murder of Shelton while engaged in a drug trafficking crime. *See* 21 U.S.C. § 848(e)(1)(A). As relevant here, the "essential conduct elements," *Bowens*, 224 F.3d at 309, of a § 848(e)(1)(A) violation are a drug trafficking offense and an intentional killing. *Compare Rodriguez–Moreno*, 526 U.S. at 280, 119 S.Ct. 1239. As we explained above, the underlying drug offense of conspiracy had a sufficient connection to the Eastern District of Virginia. For this reason, venue was also proper for Count Two. It is of no moment that defendants killed Shelton in Washington, D.C., because the drug conspiracy, an essential element of the § 848(e)(1)(A) offense, involved acts that were perpetrated in the Eastern District. *See, e.g., Robinson*, 275 F.3d at 377–79 (venue proper where an essential conduct element took place in district, even though murder occurred outside district); *Barnette*, 211 F.3d at 814 (same).

 This same analysis applies to Count Three, which charged defendants with violating 18 U.S.C. § 924(c)(1)(A) and (j). Section 924(c) prohibits using or carrying a firearm "during and in relation to any ... drug trafficking crime." Section 924(j), in turn, punishes "[a] person who, in the course of a violation of [§ 924(c) ], causes the death of a person through the

use of a firearm." As relevant here, the essential elements of a § 924(c)(1)(A) offense are use of a firearm and commission of a drug trafficking offense. *See Rodriguez–Moreno,* 526 U.S. at 280, 119 S.Ct. 1239 ("[W]e interpret § 924(c)(1) to contain two distinct conduct elements."); *Robinson,* 275 F.3d at 378. Because acts in furtherance of the drug conspiracy took place in the Eastern District, the drug trafficking element of § 924(c) is satisfied. And because a violation of § 924(c) is itself a conduct element of § 924(j), *see Robinson,* 275 F.3d at 378, venue was proper for Count Three.

■■■ The common denominator in every count in this case was a drug offense which involved various acts in the Eastern District. While the government may well have been able to try defendants in other districts, our venue rules make clear that where venue lies, the choice among acceptable fora is one for the prosecution.[1]

## IV.

Defendant Smallwood next raises two issues relating to his 1996 plea agreement in the District of Columbia, in which he pleaded guilty to distributing crack cocaine. *See United States v. Smallwood,* 311 F.Supp.2d 535, 538 (E.D.Va.2004). In this agreement, Smallwood promised to assist authorities investigating the Fleming drug ring, and the Government agreed that it would "not use against [Smallwood], in any criminal proceeding, any of the

information or materials provided to the United States by [Smallwood]."

■■■ Smallwood first argues that his plea agreement entirely prevented the government from prosecuting him for Shelton's murder and the related firearm offense in the Eastern District. We disagree. The plea agreement made no mention of Shelton's murder. Paragraph 18 of Smallwood's plea agreement specifically provided that other United States Attorney's Offices "remain[ed] free to prosecute [Smallwood] for any offense(s) committed within their respective jurisdictions." As we have explained in our venue discussion above, both the murder and firearm charges in this case required proof of a drug conspiracy, acts in furtherance of which took place in the Eastern District. They were thus "committed" there for the purposes of the plea agreement, and that agreement accordingly did not bar Smallwood's prosecution here.

■■■ Smallwood next contends that his plea agreement granted him "derivative use" immunity, and that the district court consequently erred in failing to conduct a *"Kastigar* hearing." *See Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The government responds that the plea agreement conferred "use immunity" only, and that a hearing was not required. Use immunity prevents the prosecution from directly utilizing immunized testimony itself; derivative use immunity is broader, and additionally pre-

---

1. Defendants also argue that even if venue was proper in the Eastern District, the district court abused its discretion in refusing to transfer their case to the District of Columbia. *See* Fed.R.Crim.P. 21. As in the civil context, *see Saudi v. Northrop Grumman Corp.,* 427 F.3d 271, 277 (4th Cir.2005), district courts are vested with substantial discretion in deciding whether a criminal case merits transfer to another district, and we conclude that the district court did not abuse its discretion here.

As the district court explained, transfer was not warranted in this case because, inter alia, the Eastern District was geographically proximate to Washington, D.C., thereby causing little additional inconvenience, and because more than twelve other participants in this same conspiracy had already been prosecuted in the Eastern District. *See United States v. Smallwood,* 293 F.Supp.2d 631, 640 (E.D.Va. 2003).

cludes the use of evidence that may be derived therefrom.[2] *See, e.g., United States v. Dudden,* 65 F.3d 1461, 1467 (9th Cir.1995); *see also* 18 U.S.C. § 6002.

In *Kastigar,* the Supreme Court held that, consistent with the Fifth Amendment right against self-incrimination, the government may compel a defendant to testify if it accords him both use and derivative use immunity. *See Kastigar,* 406 U.S. at 453, 92 S.Ct. 1653; *see also* 18 U.S.C. § 6002; *United States v. Squillacote,* 221 F.3d 542, 558–59 (4th Cir. 2000); *United States v. Harris,* 973 F.2d 333, 336 (4th Cir.1992). When the government brings charges against such an immunized individual, it must in a *Kastigar* hearing "demonstrate that all its evidence came from sources independent of the compelled testimony." *Harris,* 973 F.2d at 336.

Here, however, the defendant has provided information voluntarily by agreement rather than by compulsion. In these situations, there is no Fifth Amendment interest at stake, and the government is not obligated to provide use or derivative use immunity, much less both. *See Dudden,* 65 F.3d at 1467 (explaining that "the government can grant the defendant varying degrees of immunity" when testimony is not compelled); *United States v. Kilroy,* 27 F.3d 679, 685 (D.C.Cir.1994) ("The fact that [18 U.S.C. § 6002] affords derivative use immunity does not ... compel a conclusion that the plea agreement afforded

more than a direct use immunity."); *United States v. Eliason,* 3 F.3d 1149, 1154–55 (7th Cir.1993); *United States v. Crisp,* 817 F.2d 256, 258 (4th Cir.1987). Rather, when immunity is included in a bargained-for plea agreement, the degree of protection to which a defendant is entitled is a matter of contract interpretation that depends on the language in the agreement itself. *See Crisp,* 817 F.2d at 258.

In this case, the plea agreement unambiguously conferred use immunity only. Paragraph 14 specifically provides that "the United States will not use against [Smallwood], in any criminal proceeding, any of the information or materials provided to the United States by [Smallwood]." The clear import of this language is that immunity is limited to the information that Smallwood himself provided. There is no suggestion in the agreement that the government is also prohibited from using information derived from immunized testimony and materials. *Compare Harris,* 973 F.2d at 334, 336 (derivative use immunity where agreement stated that "[n]othing contained in any statement or testimony given by you pursuant to this agreement *or any evidence developed therefrom,* will be used against you directly *or indirectly* ") (emphasis added). Thus, to the extent that a full *Kastigar* hearing is ever appropriate in non-compulsion cases, *see United States v. McHan,* 101 F.3d 1027, 1035–36 (4th Cir. 1996), it was not required in this case.[3]

---

2. The district court expressly found that the government honored Smallwood's use immunity, *see Smallwood,* 311 F.Supp.2d at 540 n. 7, and he does not contend otherwise on appeal.

3. Smallwood additionally draws our attention to *United States v. Kilroy,* 27 F.3d 679 (D.C.Cir.1994), and *United States v. Plummer,* 941 F.2d 799 (9th Cir.1991), and argues that courts have been willing to infer derivative

use immunity from contextual ambiguity in the word "use." These citations are inapposite, because Smallwood's plea agreement is unambiguous. In *Kilroy,* the agreement in question referred specifically to "use immunity." 27 F.3d at 685. Smallwood's agreement lacks this language, which the *Kilroy* court described as a specialized term of art with "a common understanding ... in the criminal justice world" that included derivative use immunity. *Id.* (internal quotation marks

The government may offer various levels of immunity in a plea agreement, and it is the role of courts to enforce the arrangement the parties have struck.[4]

## V.

 Defendants finally challenge their sentences, contending that the district court contravened *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), by treating the Sentencing Guidelines as mandatory. *See United States v. White*, 405 F.3d 208, 216–17 (4th Cir.2005) (describing statutory *Booker* error). Defendants did not raise this objection in the court below, and we thus review for plain error. *See United States v. Collins*, 412 F.3d 515, 524 (4th Cir.2005).

Defendants are correct that the district court committed plain error by imposing sentences under the mandatory Guidelines regime. *See Collins*, 412 F.3d at 524–25. But they cannot show the error was prejudicial, *see White*, 405 F.3d at 223–24, and their *Booker* claim thus fails. While the district court did acknowledge that the Guidelines conferred limited discretion, it "made no statements at sentencing indicating that it wished to sentence [defendants] below the guideline range." *Id.* at 223–24, 125 S.Ct. 738. In fact, the district court separately remarked to both defendants that the murder of Shelton was a "terrible crime." On the record before us, there is,

therefore, "no nonspeculative basis for concluding that the treatment of the guidelines as mandatory" affected defendants' sentences. *Id.* at 223, 125 S.Ct. 738.

## VI.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

omitted). In *Plummer,* the Ninth Circuit found that "use" included derivative use, but the agreement at issue in that case included broader language stating that information provided by the defendant "will not be used against him *or to incriminate him."* 941 F.2d at 803 (emphasis added). In addition, a government investigator who had participated in the defendant's interviews had offered inconsistent testimony about whether the agreement conferred use or derivative use immunity. *Id.* at 804–05. In this case, by contrast, there is no similarly broad language, nor has there been any inconsistency in the govern-

ment's position. We express no opinion on whether the language in the agreements at issue in *Kilroy* and *Plummer* would be sufficient to confer derivative use immunity, but rather that they do not compel a different result in this case.

4. Defendants raise various other allegations of error pertaining to evidentiary matters and the sufficiency of the evidence. We have reviewed these claims and find them to be without merit.