**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

No. 08-5044

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ROMAINE ABDUL SHORT,

Defendant - Appellant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News.   Rebecca Beach Smith, District Judge.  (4:07-cr-00123-RBS-3)

---

Argued:  May 14, 2010                    Decided:  July 2, 2010

---

Before DUNCAN, Circuit Judge, HAMILTON, Senior Circuit Judge, and Arthur L. ALARCÓN, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

---

Affirmed by unpublished opinion.  Judge Duncan wrote the opinion, in which Senior Judge Hamilton and Senior Judge Alarcón joined.

---

**ARGUED:** James Brian Donnelly, PRICE, PERKINS, LARKEN & DONNELLY, Virginia Beach, Virginia, for Appellant.  Howard Jacob Zlotnick, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.  **ON BRIEF:** Dana J. Boente, United States Attorney, Alexandria, Virginia, Richard Cooke, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond,

Virginia; Caitlin Parker, Third Year Law Student, WILLIAM & MARY SCHOOL OF LAW, Williamsburg, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

This appeal arises from a conviction and sentence for conspiracy to possess with intent to distribute marijuana and cocaine base, in violation of 21 U.S.C. § 846; use and carry of a firearm in relation to drug trafficking, in violation of 18 U.S.C. § 924(c); conspiracy to obstruct, delay and affect commerce by robbery, in violation of 18 U.S.C. § 1951(a); possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D), and 18 U.S.C. § 2; robbery affecting commerce, in violation of 18 U.S.C. § 1951(a); and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The appellant challenges the district court's denial of his motion to dismiss the indictment based on immunity and his motion to suppress evidence seized during a house search. He also challenges the court's decision to impose a mandatory minimum of life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A). For the reasons that follow, we affirm.

I.

A.

Starting in the 1990s, Romaine Abdul Short, together with others, belonged to a group known as "The Creek Boys." This group, among other things, manufactured powder into cocaine

3

base, sold crack cocaine, and robbed other drug dealers of controlled substances. In December 2004, Detective Eric Kempf of the Federal Violent Crimes Task Force learned of Short's activities, and asked Short if he would be willing to provide him with some information. Short, who was then in custody on pending state drug violations, agreed, and thereafter, Detective Kempf and Short met several times from December 17, 2004 through March 2, 2005. During those meetings, Short described his involvement in crack cocaine and marijuana dealing, and gave Detective Kempf several names. Short also testified before a grand jury on drug related matters involving James Frink, Ricky Frink, and Germell Allmond. Afterwards, Detective Kempf sent a letter to the Newport News Commonwealth Attorney's Office, detailing Short's cooperation. As a result of this letter, the state charges against Short were reduced.

Short's criminal activity continued after 2005. On April 15, 2006, he and Sam Wallace, another Creek Boy, arranged to meet a drug dealer named Joseph Ocasio. Wallace had told Ocasio's contact, Sammy Zaharopoulos, that they wanted to buy marijuana, but they actually planned to rob Ocasio. In preparation, Short sought assistance from Demario Boyd, who Short knew always carried a gun, would "straight take the weed from [Ocasio]," and would only ask for a small amount of

4

marijuana in return. J.A. 573. That evening, Wallace picked up Short and Boyd in his car and headed to the Bayberry Shopping Center to meet Ocasio. While the marijuana purchase was taking place, Boyd brandished his gun and shot Ocasio in the back of the head, killing him. Wallace and Boyd quickly fled on foot, while Short, carrying Ocasio's marijuana sample, drove away in Wallace's car.

Responding to the murder, Detective Robert Vasquez located and apprehended Wallace. Upon questioning him, Detective Vasquez learned that Short had been involved in the Ocasio murder. The next day, Detective Vasquez and his partner Detective Richard Espinoza visited Short's residence with ten to twelve other police officers.[1] Detective Espinoza knocked on the door, announced himself, and then asked everyone inside to come out. Short came out with his wife Shenika Short ("Ms. Short") and two children. He was placed in handcuffs and then taken to the police station for questioning. At the same time, Detective Steven Smithley obtained consent to search the house from Ms. Short. In the house, police officers found, among other things,

---

[1] Detective Espinoza explained that they took such a large contingent because Boyd, potentially armed and dangerous, remained at large and could have been with Short, and because they had "not recover[ed] the murder weapon from the scene." J.A. 56.

5

marijuana, a digital scale, and a sealed plastic bag containing $1,000.

## B.

Based on the Ocasio murder, the subsequent search, and evidence that from 1996 through 2007, Short purchased and sold firearms, marijuana, crack cocaine, and powder cocaine; robbed several drug dealers; and was armed with a weapon while drug trafficking, a federal grand jury in the Eastern District of Virginia indicted Short on September 12, 2007, for conspiracy to possess with intent to distribute marijuana and cocaine base in violation of 21 U.S.C. § 846; conspiracy to obstruct, delay, and affect commerce by robbery in violation of 18 U.S.C. § 1951(a); possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D), and 18 U.S.C. § 2; robbery affecting commerce in violation of 18 U.S.C. § 1951(a); and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). The government later filed a superseding indictment that added charges for possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), (b)(1)A)(iii) and 18 U.S.C. § 2, and possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1).

In January 2008, Short moved to suppress the evidence seized during the warrantless search of his home on the ground that police conducted the search without valid consent. During a hearing on the motion, Detective Smithley testified that, following Short's departure, Detective Smithley approached Ms. Short, "explained to her what was going on, and then ultimately just asked for a consent search for the residence." J.A. 113. He further testified that, after Ms. Short agreed to cooperate, he obtained a consent form, "explained [it] to her," and watched her sign it. J.A. 113. According to Detective Smithley, police officers began the search only after obtaining consent. Ms. Short also testified and provided a different account. Although she admitted giving consent, Ms. Short said that police officers entered her home before she had consented, and that she finally gave consent only because an officer said that she and her children would "have to stand outside until they got a search warrant." J.A. 180. Ms. Short explained, "I didn't want me and my kids to stand outside. It was kind of cold, so I didn't think I had nothing to hide in my house, so I signed it." J.A. 182. Ultimately, the district court found her testimony not credible and, concluding that "Ms. Short did give consent," denied Short's motion to suppress the evidence seized from his house. J.A. 274.

Several months later, Short moved to dismiss the superseding indictment on the ground that he had received immunity by cooperating with law enforcement regarding his March 2005 grand jury testimony. During a hearing on the motion, Detective Kempf explained that, although he gave Short a limited promise in exchange for his cooperation, there was an important caveat: "[S]ince Mr. Short was in custody, . . . I advised him that any cooperation he gave would be related to the Commonwealth Attorney since he had pending charges. By law no promises could be made by me. I don't have the authority to make any promises." J.A. 312.

Short also testified and provided a different account. He said that Detective Kempf told him that "the only way that [he] w[ould] be safe from ever getting prosecuted for any [of these crimes] was for [him] to tell [Detective Kempf] everything from the first time [he] ever picked up a blunt weed." J.A. 343. Accordingly, Short testified that he had provided Detective Kempf with his entire criminal background, believing that he would therefore be "protect[ed]." J.A. 350.

During the hearing, Short also submitted his grand jury testimony as proof of immunity. During the grand jury proceeding, Short admitted to "hustling" and then asked the prosecutor whether he would get in trouble for this admission.

8

J.A. 1477.  The prosecutor responded, "No, you are fine."  Id.

After confirming that Short was telling the truth and did not

shoot anyone, the prosecutor said, "You're fine.  Go ahead."

Id.  According to Short, the prosecutor was "verifying"

Detective Kempf's promise of immunity in exchange for Short's

grand jury testimony.  J.A. 351-52.

Ultimately, the district court denied Short's motion to

dismiss the superseding indictment.  It found that, at most,

"[Short] had an informal use immunity agreement related to his

grand jury testimony" and also that "none of the charges in the

superseding indictment are related to [Short's] brief grand jury

testimony at issue here."  J.A. 1202-03.

The case then proceeded to trial and Short was found guilty

on all but two counts.[2]  After calculating Short's applicable

guideline range under the federal sentencing guidelines, the

district court imposed the mandatory minimum penalty of life

imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A) based upon two

prior felony drug convictions.  This appeal followed.

---

[2] Short was not found guilty of possessing a firearm in
relation to a drug trafficking crime, in violation of 18 U.S.C.
§ 924(c)(1)(A), and knowingly and intentionally possessing with
(Continued)

9

II.

On appeal, Short challenges the district court's orders denying his motion to dismiss the superseding indictment and his motion to suppress. He also challenges the court's application of 21 U.S.C. § 841(b)(1)(A). We consider each matter in turn.

A.

We consider first the district court's denial of Short's motion to dismiss the indictment based on a grant of immunity. We review the district court's factual determinations concerning the existence and scope of an alleged immunity agreement for clear error, see United States v. Martin, 25 F.3d 211, 217 (4th Cir. 1994) (applying standard of review to plea agreement), and its application of the law de novo, see United States v. Smith, 976 F.2d 861, 863 (4th Cir. 1992).

In this context, immunity may be either "transactional immunity" or "use and derivative use immunity." Kastigar v. United States, 406 U.S. 441, 443 (1972). Transactional immunity "accords full immunity from prosecution for the offense to which the . . . testimony relates." Id. at 453. Use and derivative use immunity prohibits the use of testimony or any evidence

---

intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), (b)(1)A)(iii) and 18 U.S.C. § 2.

10

derived from that testimony against the witness in a criminal prosecution. See id. at 452-53. Under this latter type of immunity, the witness still may be prosecuted for crimes about which he testifies if the government proves that it has other evidence that is derived from a source wholly independent of the testimony. United States v. Jarvis, 7 F.3d 404, 414 (4th Cir. 1993) (finding that "the government [is] free to use any other evidence to prosecute").

While an immunity agreement is typically "made when the parties verbally express their mutual assent to its essential terms, it may also be implied when the parties' conduct manifests their agreement." United States v. McHan, 101 F.3d 1027, 1034 (4th Cir. 1996). Under the doctrine of "equitable immunity," immunity exists where: "(1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government." Id. Ultimately, however, the defendant bears the burden of proving the existence of an equitable immunity agreement. Id.

Applying this standard, the district court determined that Short failed to meet his burden of proving the existence of transactional immunity. At most, the district court noted,

"based on a review of [Short's] grand jury testimony . . . [Short] had an informal use immunity agreement related to his grand jury testimony." J.A. 1202. However, because Short "testified at the grand jury regarding matters and individuals which form no part of the current charges against [Short] in the superseding indictment," J.A. 1202, the district court found that "even if [Short] did have [use] immunity as to his grand jury testimony, there has clearly been no violation by the United States," J.A. 1203. Short now challenges these findings. As proof that he received immunity, Short cites the statements made by the prosecutor before the grand jury as well as Detective Kempf's statement that if Short told the truth and had not shot anyone, he would "be alright and not be prosecuted." Appellant's Br. at 19.

Nothing in the record persuades us that the district court clearly erred in finding that the government did not agree to give Short immunity based on his interactions with Detective Kempf. Short testified that Detective Kempf told him that "the only way that [he would] be safe from ever getting prosecuted for any of [his previous crimes] was for [him] to tell [Detective Kempf] everything from the first time [he] ever picked up a blunt weed." J.A. 343. By contrast, Detective Kempf explained that prior to their interview, he "advised him

12

that any cooperation . . . would be related to the Commonwealth Attorney since he had pending charges," but that "[b]y law no promises could be made by [him]" because he did not have the authority. J.A. 312. Ultimately, the district court found Detective Kempf credible and Short unworthy of belief. We are given no reason to challenge that credibility finding, particularly since during his testimony, Short admitted to lying to a probation officer about his drug use "to help [him]self." J.A. 359. See United States v. Thompson, 554 F.3d 450, 452 (4th Cir. 2009) ("[W]hen a district court's factual finding is based upon assessments of witness credibility, such finding is deserving of the highest degree of appellate deference." (internal quotations omitted)). The record indicates, at most, that Detective Kempf promised Short that he would write a letter on his behalf to the Commonwealth Attorney. Detective Kempf kept his promise, and as a result of this letter, Short was able to plead guilty to a reduced charge on a pending state matter.

The only other evidence offered in support of Short's motion was the grand jury testimony, but Short's colloquy with the prosecutor does not evidence "a meeting of the minds that the government would refrain from further prosecuting him in exchange for his cooperation," and thus, Short cannot establish transactional immunity. McHan, 101 F.3d at 1034. All this

13

colloquy shows is Short asking the prosecutor whether he would get in trouble for "hustling," and the prosecutor reassuring him that he would be fine.  J.A. 1477.  Even assuming that this colloquy can be construed as a grant of use immunity, the district court found, as a matter of fact, that the charges contained in the superseding indictment were based on independent sources of information, and not based on any matters disclosed by Short during his grand jury testimony.  Short offers no evidence to rebut this finding,[3] and thus, we conclude

---

[3] At oral argument, Short argued that if we find that he was entitled to use immunity, we must find that the district court erred in failing to conduct a Kastigar hearing.  United States v. Harris, 973 F.2d 333, 336 (4th Cir. 1992) (noting that in a Kastigar hearing, the government must "demonstrate that all its evidence came from sources independent of the compelled testimony").  We disagree.  "Whether the oral use-immunity agreement at issue in this case is subject to the full Kastigar protections is doubtful because [Short] voluntarily cooperated with the government."  McHan, 101 F.3d at 1036; see also United States v. Roberson, 872 F.2d 597, 611-12 (5th Cir.) (holding that where cooperation was not compelled but was voluntarily provided pursuant to a state immunity agreement, that agreement cannot bind federal prosecutors), cert. denied, 493 U.S. 861 (1989); United States v. Eliason, 3 F.3d 1149, 1152-53 (7th Cir. 1993) (same); United States v. Camp, 72 F.3d 759, 761 (9th Cir. 1995) (same), cert. denied, 517 U.S. 1162 (1996).  Further, to the extent that a full Kastigar hearing is ever appropriate in non-compulsion cases, it was not required in this case because, at most, the government provided Short with use immunity, not derivative use immunity, and there is no evidence in the record showing that the government directly used the immunized testimony.  See United States v. Smith, 452 F.3d 323, 337 (4th Cir. 2006) (finding no Kastigar hearing is required where the agreement conferred use immunity only, and the government did not use the immunized testimony).

14

that the district court did not clearly err in finding that if Short was granted use immunity, the government did not violate that agreement. See United States v. Jones, 542 F.2d 186, 199 (4th Cir. 1976) (findings of fact related to independence of evidence from immunized testimony will be overturned only if clearly erroneous), cert. denied, 426 U.S. 922 (1976).

Because Short never had transactional immunity and the government did not violate any purported agreement for use immunity, we find no error in the district court's denial of Short's motion to dismiss.

B.

We next consider the district court's denial of the motion to suppress. In ruling on a motion to suppress, we review the district court's legal conclusions de novo and its underlying factual findings for clear error. United States v. Buckner, 473 F.3d 551, 553 (4th Cir. 2007).

Short argues that the district court erred in finding that his wife consented to the search of his home. He maintains that his wife's consent was an involuntary acquiescence to a claim of lawful authority, given only after the official conducting the search asserted he would obtain a warrant, if necessary. Thus,

he contends the district court should have suppressed the evidence obtained through the search of his home.

In determining whether consent to search was freely and voluntarily given, we examine the totality of the circumstances surrounding the consent. United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en banc). In viewing the totality of the circumstances, it is appropriate to consider "the characteristics of the [person giving consent] (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." Id. Whether the person giving consent knew that she possessed a right to refuse consent also is relevant in determining the voluntariness of consent, although the government need not demonstrate that the person giving consent knew of her right to refuse consent to prove that the consent was voluntary. Id.

The district court determined that Ms. Short voluntarily consented to the search. The district court found:

> Ms. Short did give consent. She said it was okay to search. She voluntarily and knowingly signed the consent to search form.
>
> The witness who testified -- Detective Smithley, I believe is his name -- was a very credible witness. He didn't appear at all rude or forceful or intimidating, and I specifically asked Ms. Short if

16

the officer was courteous to her, and she said, oh, yes, he was courteous. There was nothing that was overpowering about this situation, and I would find as a fact that Ms. Short did okay the search, that she was an appropriate individual to consent to the search, she lived there, she was his wife, and that the search was appropriate without a warrant as a consent search.

J.A. 274-75.

Based on our review of the totality of the surrounding circumstances, we cannot say that the factual finding of the district court that Ms. Short's consent was voluntary was clearly erroneous. On the date of the search, Ms. Short was 26 years old, the mother of two children, and held employment with North End Cab Company. Testimony also established that she had dealt with police officers before and been arrested on a number of occasions. Further, Ms. Short admitted to signing the consent form and not revoking that consent at any time during the search. It is true that Ms. Short testified, on several occasions, that she agreed to sign the document because otherwise, she "and [her] kids [would have] to stand outside" in the cold while the police obtained a warrant.[4] J.A. 182. She also admitted, however, that she signed the consent form because

---

[4] Strangely enough, after giving consent, Ms. Short testified that she and her step-daughter stayed outside on the porch while the officers searched the home. When asked why she stayed outside when her stated reason for signing the form was (Continued)

17

she "didn't think at the time . . . there was anything to get in [her] house."  J.A. 184-85.  Moreover, she explained that she found the police officer that asked for the consent "courteous." J.A. 191.  Based on this record, the conclusion that Ms. Short's oral consent was given voluntarily is amply supported; indeed, we may safely say that no other opinion is supportable.

Nevertheless, Short argues that the police officer's statement that he could apply for a warrant if Ms. Short denied consent invalidated the consent.  We disagree.  "The fact that a search warrant was mentioned does not necessarily constitute a coercive factor negating consent."  United States v. Hummer, 916 F.2d 186, 190 (4th Cir. 1990) (internal quotations and citation omitted), abrogated on other grounds by United States v. Hairston, 96 F.3d 102, 106 (4th Cir. 1996).  On the contrary, this is but one factor to consider in determining whether voluntary consent was given, and can be negated if the person giving consent "is advised several times orally and in writing of [her] right to refuse the search."  Id.; see also United States v. Dennis, 625 F.2d 782, 793 (8th Cir. 1980) (finding voluntary consent, although consent was given after officers informed defendant that they would seek a warrant if consent was

---

so she would not be forced to stand outside, she answered, "I don't know.  But I just did."  J.A. 193.

18

not given); United States v. Drennen, No. 96-4301, 1997 WL 543379, at *4 (4th Cir. Sept. 5, 1997) (same). Here, Ms. Short was given a form that delineated her rights, and she was told orally by a police officer that she didn't need to consent. In light of these circumstances, we find that the district court did not clearly err in finding that Ms. Smith gave informed, voluntary consent to search her home. This is particularly so in light of the rule that when the lower court bases its ruling on oral testimony heard at a suppression hearing, such as is the case here, the ruling may not be disturbed "unless it can be said that the view of the evidence taken by the district court is implausible in light of the entire record."[5] Lattimore, 87 F.3d at 651.

---

[5] Short also argues that the evidence should have been suppressed because the search resulted from his unlawful arrest. See Wong Sun v. United States, 371 U.S. 471, 485 (1963) (finding that generally "evidence which derives . . . immediately from an unlawful entry and an unauthorized arrest . . . is . . . the 'fruit' of official illegality," and should be suppressed). We disagree. Not all evidence "is [the] 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." Id. at 487-88. "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Id. at 488 (quoting Maguire, Evidence of Guilt, 221 (1959)). Here, Short has proposed no explanation, and we see none, for how the search resulted from the purported unlawful arrest. Thus, we find Short's argument without merit.

Finally, we consider the district court's determination that Short was subject to a mandatory minimum sentence of life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A). "We review de novo the district court's interpretation of the statute and conclusion that [Short's] prior convictions were predicate offenses under the statute." United States v. Hawkins, 548 F.3d 1143, 1149 (8th Cir. 2008).

Section 841(b)(1)(A) provides that if any person commits a federal drug offense involving 50 grams or more of cocaine base "after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release." 21 U.S.C. § 841(b)(1)(A). Because the jury convicted Short of conspiracy to possess with intent to distribute cocaine base in excess of 50 grams, and because Short was convicted in state court in March 2004 and December 2005 of two felony drug offenses, the district court found that an enhancement under § 841(b)(1)(A) was appropriate.

Short argues that the district court erroneously relied on these two state convictions to enhance his sentence because the government had failed to establish that they were not part of the same conspiracy charged in Count 1 of the superseding

20

indictment. He reasons that these two convictions cannot be "prior felony drug offense[s]" for purposes of § 841(b)(1)(A) because they occurred while the charged conspiracy was taking place. We disagree.

We have squarely held that, for purposes of § 841(b)(1)(A), "[w]hen a defendant is convicted of a drug conspiracy under 21 U.S.C. § 846, prior felony drug convictions that fall within the conspiracy period may be used to enhance the defendant's sentence if the conspiracy continued after his earlier convictions were final." United States v. Smith, 451 F.3d 209, 225-26 (4th Cir. 2006); see also United States v. Moore, 305 F. App'x 130, 134 (4th Cir. 2008) (finding that 2000 and 2003 convictions could be considered prior convictions for sentencing enhancement purposes where conspiracy began in 1987 and continued through 2005). Here, the charged conspiracy continued through 2007, and thus, we find no error in the district court's use of Short's 2004 and 2005 convictions for § 841(b)(1)(A) enhancement purposes.[6]

_____

[6] Short also argues that the court erroneously applied the base offense level from section 2A1.1 in the U.S. Sentencing Guidelines. Because he faced a statutory mandatory minimum sentence of life imprisonment, however, his guideline sentence was necessarily life imprisonment pursuant to section 5G1.1. See U.S.S.G. § 5G1.1(b) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline (Continued)

21

III.

For the foregoing reasons, we

AFFIRM.

---

range, the statutorily required minimum sentence shall be the guideline sentence."). The issue is thus moot.