**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-4968

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RICHARD N. GARRIES,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News. Rebecca Beach Smith, District Judge. (4:08-cr-00050-RGD-JEB-1)

Argued: September 23, 2011          Decided: October 25, 2011

Before TRAXLER, Chief Judge, and WILKINSON and NIEMEYER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Lawrence Hunter Woodward, Jr., SHUTTLEWORTH, RULOFF, SWAIN, HADDAD & MORECOCK, PC, Virginia Beach, Virginia, for Appellant. Brian James Samuels, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia, Katherine Reynolds, Third Year Law Student, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Richard Garries was indicted on twenty-four counts, including conspiracy to commit mail and wire fraud, and multiple counts each of mail fraud, wire fraud, and making false statements. The charges arose from a wide-ranging scheme to defraud that centered on real estate transactions funded by sub-prime mortgages arranged by Garries. The jury convicted Garries of all counts, and the district court sentenced him to 240 months' imprisonment. Garries appeals. Finding no reversible error, we affirm.

I.

We briefly summarize the evidence presented at trial, viewing the evidence, as we must, in the light most favorable to the government. See, e.g., United States v. Young, 609 F.3d 348, 355 (4th Cir. 2010).

In 2003, Garries pleaded guilty to wire fraud, after selling forged and fraudulent vehicle financing contracts on the secondary market. Garries was sentenced to twenty-five months' imprisonment, followed by a term of supervised release.

After he was released from prison in 2005, Garries began working as a mortgage originator for Security First Funding, a mortgage brokerage company in Newport News, Virginia. Security First and the mortgage lenders with which it had relationships

2

focused on "sub-prime" mortgages -- mortgages offered to higher-risk borrowers. The government's evidence established that Garries and his staff did whatever was necessary to make a given client appear to qualify for a loan. Garries (or his staff at his direction) inflated the income of loan applicants so the applicants would meet the lender's required debt-to-income ratio. They altered or created out of whole cloth any documents necessary to support the inflated income or to meet other lender requirements, sometimes forging the applicant's signature and other times cutting a legitimate signature from one document and pasting it onto a forged document. For applicants who did not have enough money in the bank to meet the lender's requirements, Garries gave them "show money" for deposit in their accounts and took the money back after the lender verified the account balance.

Garries also worked as a "flipper," buying houses to renovate and resell. Many of Garries' Security First clients were seeking investment properties to rent or resell, and Garries frequently steered these clients to properties he owned. Garries encouraged the clients to buy the houses by falsely promising, inter alia, to give the buyers cash back after closing, to provide a renter for property, or to make any necessary repairs after closing. Appraisals for these properties often stated that the house had certain equipment or

3

fixtures that were not present when the buyer took possession, or indicated that various repairs had been done that in fact had not been done. Because of the true condition of the homes, most of the buyers were unable to resell the houses for a profit or rent the houses at a price that covered the high-interest mortgages Garries had placed them in, and they generally lost the investment properties to foreclosure.

Stuart Gordon was a "hard money" lender who provided short-term high-interest loans for Garries to buy and repair the houses he flipped. After learning that Garries was inflating his estimates for repairs and seeking draws for repairs that had not been done, Gordon began requiring Garries to show city inspection stickers and verifications before he would release money from escrow. That did not prove to be much of an obstacle for Garries -- he simply forged the inspection documents.

The conduct outlined above provided the factual basis for most of the charges alleged in the indictment. The false-statement charges, however, were based on statements Garries made to the probation officer to whom Garries reported while on supervised release following his 2003 wire-fraud conviction. As to those charges, the government's evidence established that Garries made numerous false statements about his residence, income, assets, bank accounts, and various business entities he owned or operated.

Over Garries' objection, the district court permitted Horace Goins to testify about his business dealings with Garries. The Goins transactions were not charged in the indictment, but they were very similar to the charged conduct and occurred during the same time frame as the actions charged in the indictment.

Goins testified that he received more than $80,000 through a cash-out refinancing loan arranged by Garries. Garries persuaded Goins to invest the loan proceeds in Williamsburg Restaurant Equipment and Supply, a company incorporated and operated by Garries. Garries told Goins that there was a big market for used restaurant equipment, that the company had already lined up several lucrative contracts, and that he needed capital to renovate the retail store and build an inventory. As it turned out, only a few pieces of equipment were ever bought, the company never began operations, the promised contracts never materialized, and the shares of stock promised to Goins were never issued. Not surprisingly, Goins lost all the money he had invested in the company. Goins also testified about two houses he bought through Garries that he intended to use as rental properties. Garries made false promises to Goins about the condition of the houses and their rental potential. When Goins discovered the true condition of the houses, Garries refused to make any repairs, and Goins was forced to spend significant sums

5

to make the houses habitable.  Goins ultimately lost all of his retirement savings, and he was forced to declare bankruptcy.

## II.

Under the Federal Rules of Evidence, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but such evidence is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).  On appeal, Garries challenges on Rule 404(b) grounds the district court's decisions to admit the testimony of Horace Goins and to admit evidence about Garries' 2003 wire fraud conviction.

### A.

Garries was not charged with any crimes relating to his dealings with Horace Goins, and Garries therefore argues that the Goins evidence should have been excluded under Rule 404(b). We disagree.

Rule 404(b)'s limits on admissibility do not apply to evidence of conduct that is intrinsic to the crimes charged. See United States v. Lighty, 616 F.3d 321, 352 (4th Cir.) ("Rule 404(b) limits only the admission of evidence of acts extrinsic to the one charged, but does not limit the admission of evidence

6

of intrinsic acts."), cert. denied, 131 S. Ct. 846 (2010), and 80 U.S.L.W. 3015 (U.S. Oct. 17, 2011) (No. 10-1010). Uncharged conduct is intrinsic and thus not subject to Rule 404 "if the uncharged conduct arose out of the same series of transactions as the charged offense." United States v. Siegel, 536 F.3d 306, 316 (4th Cir. 2008) (internal quotation marks omitted). Garries was charged with conspiracy to commit mail and wire fraud, and the Goins transactions arose out of the same series of transactions as the charged conspiracy. The Goins transactions were thus intrinsic to the crimes charged, and the district court properly admitted the evidence. See United States v. Muscatell, 42 F.3d 627, 631 (11th Cir. 1995) (in case where defendants "were charged with conducting a continuing scheme to defraud, characterized by land flip transactions, inflated appraisals, buyer-rebates, and fraudulent loan applications," evidence of uncharged transaction that was largely identical to those charged in the conspiracy was properly admitted as intrinsic to the crimes charged).

### B.

Garries also contends that the district court erred under Rule 404(b) by allowing the government to present evidence related to his 2003 conviction for wire fraud. Given the factual basis for the false-statement charges -- false statements Garries made to his probation officer, Garries

concedes that evidence of his supervised release status was admissible. He argues, however, that the government should not have been permitted to introduce evidence about the underlying conviction itself or details of the conditions of his supervised release and his compliance with those conditions. According to Garries, the only purpose of this detailed evidence was to assail his character, which is prohibited by Rule 404(b). We disagree.

As an initial matter, we note that much of the testimony about the terms of Garries' supervised release and his compliance with those terms was intrinsic to the false-statement charges and therefore was not, as discussed above, subject to the proscriptions of Rule 404(b). See Lighty, 616 F.3d at 352 ("Evidence is inextricably intertwined with the evidence regarding the charged offense [and thus intrinsic] if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." (internal quotation marks and alteration omitted)). And as we explain, the challenged evidence that was not intrinsic was properly admitted under Rule 404(b).

To be admissible under Rule 404(b), prior bad acts evidence must be relevant to an issue other than character, such as identity or motive; necessary to prove an element of the crime charged; and reliable. See United States v. Blauvelt, 638 F.3d

8

281, 292 (4th Cir. 2011), cert. denied, 79 U.S.L.W. 3712 (U.S. Oct. 3, 2011) (No. 10-1473); Siegel, 536 F.3d at 317-18. Rule 404(b) is "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." United States v. Young, 248 F.3d 260, 271-72 (4th Cir. 2001) (emphasis added; internal quotation marks omitted).

Given Garries' denial of involvement in the forging and altering of loan documents at issue in this case, evidence about the prior conviction was probative of his intent and knowledge on the various mail and wire fraud counts. See United States v. Queen, 132 F.3d 991, 996 (4th Cir. 1997) ("Once an act is assumed to be done, the prior doing of other similar acts is useful as reducing the possibility that the act in question was done with innocent intent." (internal quotation marks and alteration omitted)). Evidence of the restitution award was likewise probative of Garries' motive for the false statements counts, by showing why he lied to the probation officer about his bank accounts and income. Under these circumstances, we cannot say that the district court's decision to admit the challenged evidence was arbitrary or irrational. See Blauvelt, 638 F.3d at 292 ("Because judgments of evidentiary relevance and prejudice are fundamentally a matter of trial management, we defer to the discretion of trial courts and will not vacate a conviction unless we find that the district court judge acted

9

arbitrarily or irrationally in admitting evidence." (internal quotation marks and alterations omitted)).

## III.

The district court frequently interrupted and questioned Garries during his testimony, and Garries argues that the court's interference deprived him of a fair trial.[*] Because counsel for Garries did not object to the court's questioning, see Fed. R. Evid. 614(c) ("Objections to the calling of witnesses by the court or to interrogation by it may be made at the time or at the next available opportunity when the jury is not present."), we review this claim for plain error only, see United States v. Godwin, 272 F.3d 659, 672 (4th Cir. 2001).

There is no question that a trial judge has the authority to question witnesses. See Fed. R. Evid. 614(b) ("The court may interrogate witnesses, whether called by itself or by a party."); Godwin, 272 F.3d at 672 ("[A] trial judge possesses broad authority to interrogate witnesses."). When exercising this authority, however,

> the trial judge must always remember that he occupies a position of preeminence and special persuasiveness" in the eyes of the jury, and, because of this, he

[*] The presiding judge became ill after the close of testimony, and Judge Smith took over the case at the jury-instruction phase.

10

> should take particular care that his participation during trial -- whether it takes the form of interrogating witnesses, addressing counsel, or some other conduct -- never reaches the point at which it appears clear to the jury that the court believes the accused is guilty.

United States v. Parodi, 703 F.2d 768, 775 (4th Cir. 1983) (citation, internal quotation marks, and alteration omitted). The ultimate inquiry is "whether the trial judge's comments were so prejudicial as to deny a party an opportunity for a fair and impartial trial." Godwin, 272 F.3d at 679 (internal quotation marks omitted).

It is apparent from the record that Garries was a difficult witness. He rarely gave a direct answer to a question, but would instead spend paragraphs and paragraphs talking his way around the question. The district court was understandably frustrated with Garries' conduct, and a great many of the court's interruptions were attempts to get Garries to answer the question that had been asked. See, e.g., J.A. 1415-16 ("He just asked you if you made any income. Just answer the question, okay? Good speeches, but just answer the question. Then you can explain it, all right?"); J.A. 1504 ("Stop. Just stop. Answer questions."). Some of the statements perhaps may have been a bit intemperate, see J.A. 1626 ("Can you say, 'No,' N-O? Can you?"), but the court's efforts at keeping Garries focused can in no sense be considered prejudicial. See United States v.

11

<u>Smith</u>, 452 F.3d 323, 333 (4th Cir. 2006) ("[E]ven a stern and short-tempered judge's ordinary efforts at courtroom administration do not establish bias or partiality. . . . A tart remark or two might be what is needed to keep a lengthy trial on track." (internal quotation marks and alteration omitted)).

Some of the court's comments and questions, however, seem to undermine the substance of Garries' testimony. For example, when Garries was testifying about Horace Goins' investment in the restaurant supply company, the court asked Garries whether he had bought any restaurant equipment with Goins' money. Garries said that he had bought equipment, to which the court responded, "Oh, you did. What did you do with the restaurant equipment?" J.A. 1496. When Garries insisted that the company had sold some equipment, the court asked, "Who was this person who was purchasing . . . restaurant equipment? Name me just one and how much they purchased." J.A. 1497. Another problematic exchange involved Garries' testimony about Terance Boothe, who worked with Garries as a loan processor and pleaded guilty to a conspiracy charge arising from his conduct in this case. Boothe testified that he had created a phony check to convince a mortgage lender that a buyer had paid earnest money. Garries, however, testified that the buyer had actually paid earnest money -- not with the phony check that had been submitted to the

lender, but with a legitimate check that had been held in the file and not provided to the lender. The district court interrupted Garries to say, "So Mr. Boothe did this himself, and you had nothing to do with it. And he did it, and although there was perfectly valid stuff in the file he did it to screw up the transaction. Is that correct?" J.A. 1729.

We believe that the questions and comments of this nature can be construed as reflecting the district court's disdain for Garries and disbelief of his testimony, sentiments to which the jury should not have been privy. See Godwin, 272 F.3d at 678 ("[C]ross-examination of a witness by the trial judge is potentially more impeaching than such an examination conducted by an adversary attorney. The judge, by his office, carries an imprimatur of impartiality and credibility in the eyes of the jury. In fact, a judge's apparent disbelief of a witness is potentially fatal to the witness's credibility." (emphasis added; footnote omitted)); cf. Quercia v. United States, 289 U.S. 466, 470 (1933) ("It is important that hostile comment of the judge should not render vain the privilege of the accused to testify in his own behalf."). Accordingly, we will assume that Garries has satisfied his burden of demonstrating that plain error occurred.

The existence of plain error, however, is not enough to entitle Garries to relief; Garries must also show that the error

affected his substantial rights.  See Godwin, 272 F.3d at 679.

An error affects a defendant's substantial rights when the error

"actually affected the outcome of the proceedings."  United

States v. Hastings, 134 F.3d 235, 240 (4th Cir. 1998).  We have

no difficulty concluding that any error in this case did not

affect the outcome of the trial.

In Godwin, we applied plain-error review to questions and

comments made by the district court that were similar in nature

to the problematic comments at issue in this case.  See Godwin,

272 F.3d at 674-76.  While finding the court's participation in

the trial "troublesome," id. at 681, we nonetheless concluded

that the defendants could not establish that the outcome of the

trial was affected by the district court's error:  "In the face

of the overwhelming evidence presented against them by the

Government, there was no reasonable probability that the

[defendants'] good faith defense would succeed.  Where the

evidence is overwhelming and a perfect trial would reach the

same result, a substantial right is not affected," id. at 680

(citation omitted).

As in Godwin, the government's evidence in this case was

overwhelming.  At trial, the government presented almost 300

exhibits and called twenty-six witnesses, including members of

Garries' staff (one of whom was his daughter) who were involved

in the schemes and testified about their own wrongdoing and

14

Garries' awareness of and involvement in the misconduct; law enforcement officers who testified about obviously forged and altered documents found in Garries' trash and in his office files; and representatives from the mortgage lenders that approved loans in reliance on information that Garries falsified. The government also called as witnesses many of Garries' clients, who gave wrenching testimony about losing everything because they trusted the wrong man.

The only significant evidence countering the government's compelling evidence was Garries' own testimony. Garries denied being involved in any wrongdoing, but he offered no evidence to substantiate his claims, frequently claiming that the government had in its possession but refused to turn over the receipts or other documents that would show he was telling the truth. His testimony was often self-contradictory and at times was patently incredible, and it simply failed to provide a coherent explanation for the testimonial and documentary evidence presented by the government. As in Godwin, there is no reasonable probability that, had the improper questioning by the district court not occurred, the jury would have accepted Garries' claims in the face of this overwhelming evidence. Accordingly, Garries cannot establish that his substantial rights were affected by the district court's improper

15

participation in the trial, and his claim thus fails under plain-error review.

IV.

Garries raises two other issues on appeal, neither of which merits detailed discussion.

Garries first contends that the evidence was insufficient to support his convictions. The government presented evidence establishing each element of every charge against Garries, and, as discussed above, that evidence overwhelmingly established Garries' guilt. See United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997) ("Reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." (internal quotation marks omitted)).

Garries also contends that the mail and wire fraud statutes are unconstitutionally vague as applied to him. The statutes' prohibition of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C.A. §§ 1341, 1343 (West Supp. 2011), raises due process questions of vagueness if applied in "honest services" cases not involving bribery or kickbacks. See Skilling v. United States, 130 S. Ct. 2896, 2931 (2010). This case, however, did not involve honest-services fraud but instead involved "a conventional fraudulent

16

scheme to obtain money," a form of fraud that "is untouched by Skilling and remains illegal." United States v. Joshua, 648 F.3d 547, 553 (7th Cir. 2011). There is nothing vague about the statutory prohibition when applied to the conduct at issue in this case. See Skilling, 130 S. Ct. at 2927-28 (explaining that a criminal statute is not vague if it "define[s] the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement").

V.

To summarize, we find no error in the district court's admission of evidence about Garries' prior conviction or his business dealings with Horace Goins. The mail and wire fraud statutes are not unconstitutional as applied to Garries, and the evidence was more than sufficient to sustain each of the convictions. While the district court may have erred in its questioning of Garries, Garries cannot establish prejudice under plain-error review, because the evidence of his guilt was overwhelming. Accordingly, we affirm Garries' convictions.

AFFIRMED

17