**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 13-4828**

───────────

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

     v.

JEFFREY A. MARTINOVICH,

          Defendant - Appellant.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News. Robert G. Doumar, Senior District Judge. (4:12-cr-00101-RGD-TEM-1)

───────────

Argued: September 17, 2015          Decided: January 7, 2016

───────────

Before WYNN, FLOYD, and THACKER, Circuit Judges.

───────────

Affirmed in part, vacated in part, and remanded by published opinion. Judge Thacker wrote the majority opinion, in which Judge Floyd joined. Judge Wynn wrote a separate concurring opinion.

───────────

**ARGUED**: Lawrence Hunter Woodward, Jr., SHUTTLEWORTH, RULOFF, SWAIN, HADDAD & MORECOCK, PC, Virginia Beach, Virginia, for Appellant. V. Kathleen Dougherty, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF**: Dana J. Boente, United States Attorney, Alexandria, Virginia, Brian J. Samuels, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

───────────

THACKER, Circuit Judge:

During the course of a four-week jury trial, the Government sought to prove that Jeffrey A. Martinovich ("Appellant") engaged in a scheme to defraud his investment firm's clients out of millions of dollars. The jury found Appellant guilty of one count of conspiracy to commit mail and wire fraud, four counts of wire fraud, five counts of mail fraud, and seven counts of money-laundering. On September 30, 2013, Appellant was sentenced to 140 months of imprisonment, three years of supervised release, and monetary penalties.

Appellant appeals his convictions, alleging a litany of errors. Above all, Appellant contends that the district court improperly interfered with the trial proceedings and misstated the law during his sentencing hearing.

We conclude that the jury's verdict must stand, but because the district court treated the United States Sentencing Guidelines ("Guidelines") as mandatory, we vacate the sentence and remand with instructions that the matter be assigned to a different judge.

I.

A.

In or around 2000, Appellant partnered with Witt Mares & Company, a public accounting firm, to form Martinovich Investment Consulting Group ("MICG"), a financial services

2

company that provided investment services to its clients. As a broker-dealer, MICG was licensed by the Securities and Exchange Commission and regulated by the Financial Industry Regulatory Authority ("FINRA").

MICG utilized First Clearing, LLC, a non-bank affiliate of Wells Fargo, to provide brokerage account services, such as compiling and issuing investor statements and portfolio information, to MICG's clients.

In 2005, Appellant became the sole owner and Chief Executive Officer of MICG. Thereafter, MICG rapidly expanded, and as a result, incurred increased expenses for salaries, rent, marketing, celebratory events, and corporate retreats.

In November 2006, Bruce Glasser began employment with MICG as managing director of investment banking. Glasser recommended that Appellant invest in EPV Solar, Inc., a privately held solar energy company. Appellant and Glasser expected EPV's value to increase with EPV's initial public offering ("IPO") in 2008. In order to take advantage of the EPV investment opportunity, MICG created a hedge fund for MICG's clients and launched MICG Venture Strategies, LLC ("Venture Fund"). The Venture Fund consisted of only non-public assets that were not otherwise tradeable. The governing document for the Venture Fund was the Private Placement Memorandum ("PPM"). The PPM defined the Venture Fund's investment strategy and

3

objectives, including defining the manager's role.  Pursuant to the PPM, Appellant had sole authority for investment decisions, asset valuations, incentive allocation, and management fees for the Venture Fund.  EPV became its first investment with over 1.8 million shares purchased at $1.15 per share in June and September 2007.

As the Venture Fund manager, Appellant received both a 1% management fee and 20% incentive fee based on the Venture Fund's performance.  First Clearing managed the brokerage account services for the Venture Fund, and Appellant maintained the only check writing privileges for receiving and disbursing money related to the Venture Fund account.

Pursuant to the PPM, Appellant needed an independent valuation of EPV in order to calculate his management and incentive fees and value to the clients.  In turn, Appellant, through First Clearing, would provide statements, which reflected the Venture Fund's holdings and performance, to MICG's clients.  A rise in the value of the holding meant additional incentive and management fees to Appellant.

Despite the PPM's requirement for an independent valuation, Appellant, through Glasser and Steven Gifis (an EPV shareholder and broker of the MICG/EPV deal), had Peter Lynch (an EPV shareholder, consultant, and a solar industry expert)

4

conduct the valuation.[1] During the course of the valuation process, Lynch was unaware of the true intent of the valuation. Rather, Gifis told Lynch that the valuation was being done so that EPV's president could value his personal holdings. Lynch did not know the valuation was being produced pursuant to Appellant's request, was to be used to value assets held in a hedge fund, or that it would be used outside EPV.

Under these false pretenses, Lynch provided a valuation share price of $2.13 for end-of-year 2007. Based on this end-of-year valuation, Appellant took an incentive and/or management fee of $357,019, withdrawn from First Clearing.

In early 2008, Appellant added an ownership in a privately held soccer team, the General Sports Derby Partnership ("Derby Rams"), and an interest in a construction bond to the Venture Fund. In September 2008, when EPV's financing dissolved, its IPO failed to launch, thereby damaging its forecasted growth potential. As a result, MICG clients sought a return of their money. In response, Appellant proceeded to deny, discourage, and delay his clients' redemptions, yet in October 2008, he redeemed $100,000 of his own investment. Moreover, even with EPV's decline, Appellant continued to

---

[1] Appellant did not compensate Gifis, Glasser, or Lynch to produce these valuations.

encourage and recruit individuals to invest capital into the Venture Fund. In doing so, Appellant (1) sought unsophisticated investors; (2) failed to disclose EPV's dire condition; (3) misinformed investors about their redemption ability; and (4) used new investment money to pay other investors.

Needing another valuation for end-of-year 2008, in December 2008, Appellant again orchestrated an EPV share price valuation. From a share price of $2.13 in December 2007, Appellant requested that EPV show an increased share value of $2.16 for end-of-year 2008, and this $2.16 share price recommendation was submitted to Lynch. In order to support his predetermined incentive and management fees, along with EPV's predetermined valuation, Appellant also represented that the Derby Rams were valued at $7,595,000. However, the Derby Rams were actually valued at $6,000,000. On January 2, 2009, Appellant took three draws totaling $478,363.47 from the Venture Fund's First Clearing account to pay Appellant's management and incentive fees.

Lynch once again approved Appellant's predetermined price of $2.16, thinking it was only being used internally. On January 4, 2009, Appellant received confirmation that Lynch approved the $2.16 valuation. However, because of the decreased value of Derby Rams, Appellant required even more inflation to EPV's valuation to justify the incentive and management fees of

6

$478,363.47 that Appellant had already paid himself. Thus, on January 7, 2009, Appellant authored and transmitted another increased EPV valuation at $2.42, which was signed by Lynch on January 15, 2009. But a $2.42 share price was still not high enough to support Appellant's incentive and management fees. So, several hours later, on January 15, 2009, Appellant authored and transmitted yet another increased valuation at a $2.88 share price.

Appellant was aware the $2.88 share value was excessive. Even so, MICG clients received their statements from First Clearing indicating this $2.88 share value, and Appellant continued to assure investors of the Venture Fund's security. For instance, on January 16, 2009, Gifis sought MICG investors to purchase EPV shares at $1.00 per share, well below the $2.88 share value. And on January 22, 2009, Appellant himself identified and arranged for six individuals to purchase EPV stock at $1.15 per share, at the same time he was promoting the $2.88 per share value. On or about January 23, 2009, Appellant received Lynch's revised EPV valuation of $2.88 per share value.

The deception continued during the month of February 2009. On February 6, 2009, Appellant received an email from Michael Feldman, MICG's Chief Financial Officer, in which Feldman disclosed that an independent auditor was concerned that Appellant was selling shares for less than the $2.88 valuation.

7

Nonetheless, on February 25, 2009, Appellant brokered the above-referenced deal to six investors for EPV stock at $1.15 per share.

In 2009, FINRA opened an investigation into MICG, Appellant, and the valuations within the Venture Fund holdings. Meanwhile, EPV filed for bankruptcy in February 2010. In May 2010, FINRA forced MICG to close its doors, and Appellant surrendered his broker's license.

In February 2011, Appellant filed for bankruptcy under Chapter 7 of the United States Bankruptcy Code. During his bankruptcy proceedings, Appellant failed to disclose $5,800 in income and approximately $21,100 in losses that he had incurred while gambling.

Ultimately, in October 2012, Appellant was charged with conspiracy to commit mail and wire fraud, multiple counts of mail and wire fraud, and lying in a bankruptcy proceeding.

B.

At the jury trial held over four weeks in April and May 2013, the district court frequently interrupted counsel and questioned counsel's tactics. For example, at one point the district court asked Appellant's counsel to clarify his line of questioning. But when Appellant's counsel attempted to do so, the district court interrupted, "No, don't say anything."

J.A. 2639.[2]  Appellant's counsel responded, "You asked me why,"
and the district court responded, "I did, and I made a mistake."
Id.  On another occasion, the district court criticized
Appellant's counsel for developing a sequential timeline.
Shortly thereafter, however, the district court reproached
Appellant's counsel for proceeding in a non-sequential manner,
asserting, "Could we start trying to go in order?  We're now
switching back and forth. . . . So, if you can, can you go
forward so that we can follow chronologically?"  Id. at 3012.
Although the Government voiced its concerns at one point with
regard to the district court's conduct,[3] Appellant never timely
objected to any of the district court's comments, questions, or
disruptions.

After deliberating for over two and a half days, the
jury found Appellant guilty of one count of conspiracy to commit
mail and wire fraud, four counts of wire fraud, five counts of

_____

[2] Citations to the "J.A." refer to the Joint Appendix filed
by the parties in this appeal.

[3] After the district court repeatedly questioned a witness,
the Government, outside the presence of the witness, explained
"given the Court's comments and concerns about [the witness],"
it "want[ed] to be certain that the record is clear that we will
raise these and object to those concerns when we feel they're
appropriate and raise it during cross-examination."  J.A. 2705.
The Government explained that it was protecting the record and
that it was "bring[ing] this up now in terms of the Court's
concerns and the Court's questions of [the witness]."  Id.

9

mail fraud, and seven counts of money-laundering;[4] found Appellant not guilty of one count of wire fraud and two counts of money-laundering; and could not reach a verdict on three counts of wire fraud and two counts of fraudulent oaths in a bankruptcy proceeding.

C.

At sentencing, the district court -- in staunch disagreement with both parties -- stated numerous times that it viewed the Guidelines as mandatory and that its discretion was restricted to a sentence that fit within the range set forth in the Guidelines. For example, the district court opined (1) that the Guidelines were "no longer advisory," J.A. 3645; (2) "It's all where do you fit [in the Guidelines]," id.; and (3) "I will follow the Guidelines only because I have to. I find that they're not discretionary, they're mandatory," id. at 3646.

In light of these comments, both parties reminded the district court that the Guidelines are advisory. Appellant's counsel pointed out that the Guidelines were but one factor for the district court to consider and that the district court had "significant discretion . . . to depart significantly from the [G]uidelines." J.A. 3654. Likewise, the Government noted that

---

[4] On September 11, 2013, the district court granted a motion for judgment of acquittal on one money-laundering count.

10

the Guidelines were only one factor to consider, see id. at 3700, and that the "[G]uidelines are absolutely advisory," id. at 3729. Ultimately, the district court determined that the Guidelines range for Appellant was 135-168 months of imprisonment and sentenced him to 140 months.

Appellant now challenges his convictions and sentence, asserting a multitude of errors. However, only two issues warrant extended discussion on appeal.[5] First, Appellant alleges that the district court's interruptions and courtroom management style deprived him of a fair trial. Second, Appellant contends that the district court erred when it treated the Guidelines as mandatory. We address each challenge in turn.

## II.

## A.

## Judicial Interference

## 1.

We review the alleged judicial interference for plain error because Appellant neglected to raise a timely objection at trial. See United States v. Smith, 452 F.3d 323, 330-31 (4th Cir. 2006); United States v. Godwin, 272 F.3d 659, 673 (4th Cir.

---

[5] For instance, Appellant argues that the evidence presented at trial was insufficient to support his convictions for conspiracy, wire fraud, and mail fraud. We find that the evidence was clearly sufficient, and thus do not address this contention at length.

11

2001). Under this standard, we review the record for plain error that affects substantial rights, such that "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." United States v. Olano, 507 U.S. 725, 734 (1993). And "we may not intervene unless the judge's comments were so prejudicial as to deny the defendant[] an opportunity for a fair and impartial trial." Smith, 452 F.3d at 331 (internal quotation marks omitted). Furthermore, Appellant -- not the Government -- must show "that the jury actually convicted [him] based upon the trial error." Godwin, 272 F.3d at 680 (internal quotation marks omitted).

2.

Appellant contends the district court's improper interference with his trial deprived him of a fair trial. We agree that the district court crossed the line and was in error. We disagree, however, that the conduct of the trial deprived Appellant of a fair trial.

Under the Federal Rules of Evidence, "[t]he court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611(a). "The court may examine a witness regardless of who calls the witness." Fed. R. Evid.

12

614(b). "A party may object to the court's calling or examining a witness either at that time or at the next opportunity when the jury is not present." Fed. R. Evid. 614(c).

Appellant argues that the district court's general interference in the trial -- which included examining witnesses, interrupting counsel, and controlling the presentations -- deprived him of a fair trial, and but for this interference, he would not have been convicted. However, Appellant did not object to the district court's interference. Although counsel may be reticent to object to such interference by the court, failing to do so creates a high bar for appellate review. See Smith, 452 F.3d at 330 ("[F]ail[ing] to bring even a single alleged error [of judicial interference] to the district court's attention during trial . . . [does not] preserve[] this issue for appeal."). As such, this error "must have affected the outcome of the district court proceedings." Olano, 507 U.S. at 734.

3.

Here, we are once again[6] confronted with a case replete with the district court's ill-advised comments and interference.

---

[6] See, e.g., United States v. Cherry, 720 F.3d 161, 167-69 (4th Cir. 2013); United States v. Ecklin, 528 F. App'x 357, 363 (4th Cir. 2013); United States v. Garries, 452 F. App'x 304, 309-11 (4th Cir. 2011) (per curiam); Murphy v. United States, 383 F. App'x 326, 334 (4th Cir. 2010) (per curiam); United
(Continued)

First, the district court unnecessarily interrupted defense counsel's presentation of the defense at trial. For instance, when defense counsel was questioning a witness about an email, the district court intervened:

> District court: Stop. Did he get this e-mail?
>
> Defense counsel: No, sir.
>
> District court: Then you're asking him about an e-mail he did not get, correct?
>
> Defense counsel: Correct.
>
> District court: Why?
>
> Defense counsel: Because it says this should be totally --
>
> District court: No, don't say anything.
>
> Defense counsel: You asked me why.
>
> District court: I did, and I made a mistake. I'm sorry, [defense counsel], but I appreciate it. This e-mail doesn't have anything to do with [the witness].

J.A. 2639. On another occasion, the district court interjected:

> Defense counsel [to the witness]: And why is the date --
>
> District court: Stop. Have we got a date when this all took place?
>
> Defense counsel: That's what I'm asking him.

Id. at 2640.

States v. Dabney, 71 F. App'x 207, 210 (4th Cir. 2003) (per curiam).

14

Considering the numerous witnesses and exhibits involved in the case, we understand the district court's desire to keep the trial focused. At times, however, the district court became so disruptive that it impermissibly interfered with the manner in which Appellant sought to present his evidence.

> Defense counsel [to Appellant who was testifying]: All right. Now, at that point in 2005 what number of offices did you have?
>
> District court: Can we get on to somewhere near here, get up to 2007.
>
> . . . .
>
> I don't mind doing history, and it's very nice, and I understand that, but I'd like to get to the case.
>
> Defense counsel: Yes, sir. The expansion plan is part of the case, Your Honor.
>
> . . . .
>
> Defense counsel [to the defendant]: Could you tell us about the expansion plan you had to other offices?
>
> Appellant: Yes. We had expanded --
>
> District court: We're in 2007 now?
>
> Defense counsel: We're moving up to that point.
>
> District court: Well, get there. Excuse me. I want to get there, okay? We know he had expansion plans; he's talked about it. Let's get to 2007.

J.A. 2952-53. Shortly thereafter, the district court chastised defense counsel for not creating a succinct timeline:

15

> District court: Could we start trying to go in order? We're now switching back and forth. You're now in -- the last one was February, and then there was some talk about June. So, if you can, can you go forward so that we can follow chronologically?
>
> Defense counsel: I'm doing my best up here, Judge. I promise you I'll try very hard.
>
> District court: I'm not trying to interrupt you, I'm just trying to have some --
>
> Defense counsel: Continuity. I understand.
>
> District court: -- continuity.

Id. at 3012.

At another point, the district court expressed its concern over the defense counsel's litigation tactics, accusing him of going outside the trial court procedure:

> Defense counsel [to the witness]: Sure. Could you look for that letter for me, please.
>
> District court: Right now don't you think a discovery deposition is not in order?
>
> Defense counsel: I'm not conducting a deposition, Your Honor.
>
> District court: Yes, you are.
>
> . . . .
>
> District court: You've asked him to go look for something, and that is discovery. Now, I don't mind you discovering, but do it in a deposition before the trial.
>
> . . . .
>
> Okay. That's the end of that. All right. If he's got it I'll let you refer to it, but

16

> we're not going to have any more discovery
> in this case.

J.A. 1946–47.

In sum, the district court's repeated comments were imprudent and poorly conveyed. Considering the breadth of the district court's actions, from questioning witnesses and counsel to interrupting unnecessarily, we find that the district court strayed too far from convention. Ultimately, we find the district court's actions were in error.

Appellant must now overcome the second prong of the plain error standard of review. For us to overturn Appellant's convictions, the error must be so prejudicial that it affected Appellant's substantial rights, i.e., it had to change the outcome of the trial. See Olano, 507 U.S. at 734; Smith, 452 F.3d at 331. For several reasons, we cannot conclude the error has prejudiced Appellant.

4.

First, "[q]uestions of trial management are quintessentially the province of the district courts." Smith, 452 F.3d at 332; see also id. at 333 ("[E]ven a stern and short-tempered judge's ordinary efforts at courtroom administration . . . do not establish bias or partiality." (internal quotation marks omitted) (alteration in original)). The district court, pursuant to the Federal Rules of Evidence,

17

has the obligation to control the courtroom to make the case clear for the jury. See generally Fed. R. Evid. 611(a); Fed. R. Evid. 614.

Here, the district court was engaged and active in controlling a multi-week trial that involved highly complex factual issues, private equity valuations, hedge fund audits, business management structuring, numerous witnesses, and several hundred exhibits. Cf. United States v. Parodi, 703 F.2d 768, 776 (4th Cir. 1983) (analyzing the entire record rather than a few isolated comments). Moreover, the district court interrupted and interrogated both defense and Government witnesses.

Additionally, we have held, "[i]t is particularly vital that the trial judge also instruct the jurors that his comments are not binding upon them, but are only personal views expressed for the purpose of assisting them, and that they are the sole judges of the evidence." United States v. Tello, 707 F.2d 85, 88 (4th Cir. 1983). Here, the district court gave such an instruction, reminding the jury at both the beginning and end of the jury charge that the district court's opinion or comments were not important:

> Do not assume that I hold any opinion of the matters to which my questions may have related. Whatever you may think my opinion is or may be is not to be considered by you. What I think is not important. What you

18

think is important. It's not my province -- and I emphasize this -- to judge the guilt or innocence of the defendant in this case. It's yours. Remember at all times you're at liberty to disregard any comment I have made during the trial, any comment on the evidence, but you can't disregard the instructions.

. . . .

Lastly, I want to emphasize this: Don't interpret anything I have said or done during the trial as suggesting to you what I think your verdict should be. That is not my responsibility. Certainly, I have an opinion. I heard the same evidence you did. What my opinion is doesn't count, should not be considered under any circumstances. The verdict in this case is your duty and your responsibility, not someone else's. I want to emphasize that.

Supp. J.A. 7-8, 53.[7]

We recognize that one curative instruction at the end of an extensive trial may not undo the district court's actions throughout the entire trial, but we are also cognizant that Appellant failed to alert the district court of what Appellant now perceives as improper.

Beyond that, the evidence supporting the convictions in this case is overwhelming. Testimony from 28 witnesses and approximately 250 exhibits revealed that Appellant engaged in a manipulation of EPV's valuation and deceived investors in

---

[7] Citations to the "Supp. J.A." refer to the Supplemental Joint Appendix filed by the parties in this appeal.

19

continuation of his fraudulent scheme. On several occasions prior to actually receiving a share price valuation from Lynch, Appellant reported increases of EPV's valuation to his brokers and clients. The evidence showed clearly that Appellant knew the valuations were excessive, and that Appellant was the driving force behind them. Ultimately, the Government presented ample testimony and evidence that Appellant engaged in a scheme to do what was necessary to enrich himself and that he concealed this fraud from his associates and investors, among others.

In contrast, Appellant has not demonstrated, and we cannot conclude, that the district court's comments throughout several weeks of trial impacted the trial's outcome. This is evident, in part, by the jury's divided verdict. The jury independently and thoroughly deliberated for nearly three days and found Appellant guilty on seventeen charges, not guilty on three charges, and could not reach a verdict on five charges. Such a split verdict illustrates that the district court's comments were not so prejudicial as to warrant overturning Appellant's remaining convictions. See United States v. Cornell, 780 F.3d 616, 627 (4th Cir. 2015) (concluding that a long deliberation provides "adequate assurance" that the jury was not coerced, and a split verdict "reflect[s] a thoughtful and deliberate jury" (citations omitted) (internal quotation marks omitted)).

Therefore, although the district court's interferences in this case went beyond the pale, in light of the plain error standard of review and the overwhelming evidence against Appellant, the district court's conduct did not create such an impartial and unfair environment as to affect Appellant's substantial rights and undermine confidence in the convictions. Accordingly, we must uphold the jury's verdict.

B.

Sentencing

1.

We review a criminal sentence for an abuse of discretion. See Gall v. United States, 552 U.S. 38, 41 (2007) ("[C]ourts of appeals must review all sentences -- whether inside, just outside, or significantly outside the Guidelines range -- under a deferential abuse-of-discretion standard."); United States v. Dodd, 770 F.3d 306, 309 (4th Cir. 2014); United States v. McManus, 734 F.3d 315, 317 (4th Cir. 2013).

> In reviewing Appellant's sentence, we must
>
> first ensure that the district court committed no significant procedural error, such as . . . treating the Guidelines range as mandatory . . . . Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.

Gall, 552 U.S. at 51 (emphasis supplied).

21

Upon a finding of a procedural error, the error shall be subject to harmlessness review. See United States v. Dowell, 771 F.3d 162, 175 (4th Cir. 2014); United States v. Montes-Flores, 736 F.3d 357, 370 (4th Cir. 2013); United States v. Hargrove, 701 F.3d 156, 161 (4th Cir. 2012) (explaining "procedural errors at sentencing . . . are routinely subject to harmlessness review") (alteration in original) (quoting Puckett v. United States, 556 U.S. 129, 141 (2009)). The government has the burden to show that the error was harmless such that it "did not affect a defendant's substantial rights." Hargrove, 701 F.3d at 161 (internal quotation marks omitted). We have concluded, "if the resulting sentence [is] not longer than that to which [the defendant] would otherwise be subject," then the error is harmless. Dowell, 771 F.3d at 175 (alterations in original).

When a district court has treated the Guidelines range as mandatory, the sentence is procedurally unreasonable and subject to vacatur. See McManus, 734 F.3d at 318; United States v. Clay, 627 F.3d 959, 970 (4th Cir. 2010) (pursuant to Gall, holding that the improper calculation of the advisory guideline range constitutes significant procedural error); see also United States v. Mendoza-Mendoza, 597 F.3d 212, 220 (4th Cir. 2010) (remanding when "left only to speculate as to whether the

22

sentence . . . was imposed as a matter of obligation or as an exercise of judgment").

If we determine a procedural error exists, a review for the second prong -- substantive reasonableness -- is unnecessary. See United States v. Lewis, 606 F.3d 193, 201 (4th Cir. 2010) ("[I]f a sentencing court commits a significant procedural sentencing error[,] . . . our practice is to vacate and remand for resentencing before reviewing the sentence for substantive reasonableness.").

2.

Appellant claims that the district court erred in treating the Guidelines as mandatory, and that error denied him a variant sentence below the applicable Guidelines range. We agree. The district court repeatedly considered the Guidelines as mandatory.

From the outset of the sentencing hearing, the district court lectured on its inability to have discretion:

> It appears to me that the guidelines have now become more than guides. You know, the Supreme Court indicates that they are advisory; however, I find that they're more than advisory. They're reversible error if you don't follow them or give a good reason why you're not following them, **so they're no longer advisory.**

J.A. 3645 (emphasis supplied).

23

Thereafter, the district court continued to reference what it viewed as the mandatory nature of the Guidelines:

- "This hearing here is a great example of the problems that -- or the difference between the non-guidelines and the guidelines. The non-guidelines were discretionary sentencing depending upon the person and the commission of the offense. Now it doesn't make any difference who the person is. **It doesn't make any difference. It's all where do you fit.**" J.A. 3645 (emphasis supplied);

- "**I will follow the guidelines only because I have to. I find that they're not discretionary, they're mandatory,** although people think they're discretionary and although the courts have said they're only advisory. But if you don't follow them you have to give so many reasons why you don't follow them. It's tough. It really is tough." J.A. 3646 (emphasis supplied);

- "I'm saying that what [the probation officer/Government are] putting forth today is merely an outline of **what the guidelines mandate**, if the guidelines are to be considered. And I'm going to consider them. I don't agree with them. I think they're absolutely ridiculous, but I'm going to consider them." J.A. 3656 (emphasis supplied); and

- "What I'm alluding back to is what occurred prior to 1986 when the guidelines started to work. If this case had come up then, what would the sentence have been and why? And what is happening now? The sentences now are draconian. What are we accomplishing by these extremely excessive sentences **that seem to be dictated**?" J.A. 3699 (emphasis supplied).

24

Although the district court at times alluded to the fact that it had discretion, at the same time it bemoaned that such discretion was highly disfavored. See J.A. 3654 ("I have some discretion but hardly."); id. at 3655-56 ("I will try to use some discretion, apply the factors in Title 18, Section 3553(a), and give some consideration to the guidelines. . . . I'm going to consider them."). But see id. at 3733 (recognizing that the court "has to take into consideration . . . the nature and circumstances of the . . . defendant," but at the same time the court failed to "see any attributes that are given point-wise in the sentencing guidelines for doing good").

In the end, we cannot gloss over the district court's repeated misstatements as to how it perceived the Guidelines -- that is, as mandatory. And "treating the Guidelines range as mandatory" is a "significant procedural error." Gall, 552 U.S. at 51. Even though the district court analyzed other factors during the sentencing hearing, the record indicates that such analysis did not save the error. Thus, we conclude that the district court's treatment of the Guidelines as mandatory is a "significant procedural error." Id.

25

3.

Having concluded that the district court committed procedural error in treating the Guidelines as mandatory, we turn now to considering whether the error was harmless. See, e.g., Dowell, 771 F.3d at 175.

A review of the record reveals that, had the district court considered the Guidelines as discretionary, Appellant's sentence may have been lower. The district court expressed concern that the Guidelines did not provide an assignment of points for Appellant "doing good." J.A. 3733. Likewise, the Government recognized that the district court "agreed with defense counsel that the [G]uidelines had not taken into consideration [Appellant's] good character and positive attributes." Appellee's Br. 45. Yet, the district court then sentenced Appellant to 140 months of imprisonment. This was near, but not at, the bottom of the Guidelines range of 135-168 months of imprisonment.

Thus, in consideration of the district court's flawed understanding of the Guidelines, we cannot say with certainty that Appellant's sentence was "not longer than that to which [Appellant] would otherwise be subject." Dowell, 771 F.3d at 175 (internal quotation marks omitted). Accordingly, we conclude that the district court's treatment of the Guidelines

as mandatory affected Appellant's substantial rights. See Hargrove, 701 F.3d at 161. The error was not harmless.

Therefore, we are obliged to vacate Appellant's sentence and remand for resentencing. See McManus, 734 F.3d at 318; see Mendoza-Mendoza, 597 F.3d at 219 (deciding that when "there is a serious possibility the district court felt it was under an obligation to impose a Guidelines sentence, . . . the prudent course is to remand th[e] case to ensure that [the defendant's] sentence, whatever it may ultimately be, is procedurally sound."). Finally, in light of finding that the sentence was procedurally unreasonable, we do not review the sentence for substantive reasonableness. See Lewis, 606 F.3d at 201; United States v. Abu Ali, 528 F.3d 210, 260-61 (4th Cir. 2008).

C.

Appellant also asserts that the district court erred in calculating the restitution, forfeiture, and loss amount and by imposing a two-level enhancement for obstruction of justice based on Appellant's perjurious testimony. Because we vacate Appellant's sentencing on other grounds, we need not reach these issues, but leave those for the re-sentencing court to decide in the first instance. Additionally, we have considered each of Appellant's other claims on appeal, and conclude that they lack merit.

27

D.

Finally, we consider whether, in light of the district court's demeanor at trial and its statements during sentencing regarding the nature of the Guidelines, it is necessary for a different judge to be assigned to handle this matter upon resentencing. In doing so, we look to the following three factors:

> (1) [W]hether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected; (2) whether reassignment is advisable to preserve the appearance of justice; and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

United States v. Nicholson, 611 F.3d 191, 217 (4th Cir. 2010) (internal quotation marks omitted).

With these considerations in mind, we are compelled to remand for resentencing by a different judge. See United States v. Guglielmi, 929 F.2d 1001, 1008 (4th Cir. 1991), abrogated by United States v. Pridgen, 64 F.3d 147, 150 n.3 (4th Cir. 1995).

> In the rare case where a judge has repeatedly adhered to an erroneous view after the error is called to his attention, reassignment to another judge may be advisable in order to avoid "an exercise in futility [in which] the Court is merely marching up the hill only to march right down again."

28

_Id._ at 1007-08 (alteration in original) (quoting United States v. Robin, 553 F.2d 8, 11 (2d Cir. 1977)). This is that rare case. The district court was informed by both parties that the Guidelines are not mandatory, and it claimed to be aware that the Supreme Court has so held. The Supreme Court's holdings, moreover, are not ambiguous: "The Guidelines are not only _not mandatory_ on sentencing courts; they are also not to be _presumed_ reasonable." Nelson v. United States, 555 U.S. 350, 352 (2009) (per curiam). We have been clear on this matter as well: "[A] court commits statutory error if it treats the Guidelines as mandatory, rather than as advisory." United States v. Rodriguez, 433 F.3d 411, 414 (4th Cir. 2006). When a district court can still conclude that the Guidelines are "no longer advisory," J.A. 3645, in the face of such straightforward dictates and the parties' unanimous objection to its misstatement of law, remanding the case to that court with our own reminder of the correct law would most likely be "an exercise in futility," Guglielmi, 929 F.2d at 1007.

We recognize that the district court judge is keenly aware of Appellant's case, having managed the four-week trial and subsequent sentencing. Accordingly, assigning a new judge will "wipe[] the slate clean," but in light of what transpired in the original trial, "[w]e do not believe that any waste or

29

duplication would be out of proportion to the appearance of fairness a reassignment will preserve." <u>United States v. Lentz</u>, 383 F.3d 191, 222 (4th Cir. 2004); <u>see</u> <u>also</u> <u>Nicholson</u>, 611 F.3d at 218.

## III.

For the foregoing reasons, we affirm the convictions on all counts, vacate the sentence as procedurally unreasonable, and remand with instructions for further proceedings consistent with this opinion.

<u>AFFIRMED IN PART,</u>
<u>VACATED IN PART,</u>
<u>AND REMANDED</u>

WYNN, Circuit Judge, concurring:

I concur in the majority opinion, including its holding that "although the district court's interferences in this case went beyond the pale, in light of the plain error standard of review and the overwhelming evidence against Appellant, the district court's conduct did not . . . affect Appellant's substantial rights." Ante at 21. I write separately to make clear that in our role as judges, we must avoid even the appearance of improper interference and excessive interruptions of court proceedings.

Here, there was much more than an appearance of improper interference. At its core, such conduct tends to undermine the public's confidence in the integrity of the judiciary. But more importantly, such conduct challenges the fairness of the proceeding.

In United States v. Cherry, for example, we noted that the judge's remarks about the defendant's criminal history prior to a poll of the jury may have influenced the jurors, and we found those comments improper and in error. 720 F.3d 161, 167 (4th Cir. 2013). But in light of the "overwhelming" evidence and the plain error standard, we concluded that the comments, though prejudicial, ultimately did not affect the outcome. Id. at 168-69. Just a day later, in United States v. Ecklin, we again recognized that the judge had engaged in "problematic

questioning" that "undermine[d] the substance and credibility of [the defendants'] testimonies."  528 F. App'x 357, 363-64 (4th Cir. 2013).  We stated that "the court's skepticism or disbelief" of the defendants were "sentiments that should not have been expressed to the jury."  Id. at 364.  Again, however, we were constrained by plain error review.  Id. at 365.

It is well accepted that we, as judges, "must maintain such a demeanor that 'every one shall recognize that what is said from the bench is the cool and well-balanced utterance of an impartial judge, and has in it naught of the heat and partisanship of the advocate.'"  United States v. Godwin, 272 F.3d 659, 677 (4th Cir. 2001) (quoting Wallace v. United States, 281 F.2d 656, 665 (4th Cir. 1960)).  In this matter, as in Ecklin, the judge's "problematic questioning" and impermissible interferences constituted "sentiments that should not have been expressed to the jury."  528 F. App'x at 364.  And while the judge's problematic "interference" may not have changed the outcome here, it was, no doubt, plainly imprudent.  At some point, repeated injudicious conduct must be recognized by this Court as a compelling basis for finding plain error.